121 513
157 561
47a 556

121 513
113a 1 62

LEWIS E. MONTGOMERY

*v.*

SAMUEL T. BRUSH *et al.*

*Filed at Springfield September 27, 1887.*

1. TROVER—*whether the action can be maintained.* To maintain the action of trover, it must appear that the plaintiff had both the right of property and of possession, as against the defendant, at the time of the alleged conversion.

2. The fact that the plaintiff's cattle, at the time of their conversion by the defendant, were in the possession of an agent of the plaintiff, under a contract that such agent was to pasture and sell the same for the plaintiff, and of the proceeds pay him a certain amount and keep the balance for his compensation, will not defeat an action of trover by the plaintiff, for the conversion, the defendant having notice of the ownership of the cattle.

3. EVIDENCE—*declaration of agent—whether admissible against his principal.* An agent, having his principal's cattle in possession under a contract to pasture and sell them, and to pay the owner a certain sum, the agent to have all the proceeds over such sum, put them into the pasture of another, who claimed them under a contract of sale with the agent. It was *held*, in an action of trover by the principal, against the claimant, that what the agent said as to his object in putting the cattle in the pasture at the time he did so, being a part of the *res gestœ*, would be admissible in evidence on the part of the defendant, but that it was not competent for him to prove the statements of the agent, generally.

4. SAME—*statements of third persons.* On the trial of a case, the general statements of persons neither parties to the record nor in privity with the party against whom they are sought to be used, are not admissible in evidence.

33—121 ILL.

APPEAL from the Appellate Court for the Third District;— heard in that court on appeal from the Circuit Court of Sanga- mon county; the Hon. JAMES A. CREIGHTON, Judge, presiding.

The appellees, Edward McGuire and Samuel T. Brush, recovered a judgment of $1500 in the circuit court of San- gamon county, against the appellant, Lewis E. Montgomery, in an action of trover, for the alleged conversion of one hun- dred and thirty-one head of cattle belonging to the plaintiffs. This judgment, on the appeal of Montgomery, was affirmed by the Appellate Court for the Third District, and the defend- ant again appealed.

The cattle in question were a part of a lot of two hundred and eighteen, which are conceded to have belonged to the plaintiffs on the 16th day of June, 1885. They were then in Jackson county, where the plaintiffs reside. On that day the plaintiffs entered into a written contract with Milligan & McIlvane, in respect to the pasturage, keep and sale of the cattle, which contract is as follows:

"This agreement, made and entered into this sixteenth day of June, A. D. 1885, between Edward McGuire and Samuel Brush, of Carbondale, Illinois, party of the first part, and Milligan & McIlvane, a firm composed of W. M. H. Milligan, of Perry county, Illinois, and T. D. McIlvane, of Christian county, Illinois, party of the second part, witnesseth: That the said party of the first part have, on the date of this agree- ment, appointed the said firm of Milligan & McIlvane their agents to sell a certain lot of cattle, and have this day con- signed to the said firm, at Moawequa, in Christian county, Illinois, to be transported by the Illinois Central Railroad Company, the said lot of cattle, consisting of two hundred and eighteen (218) head, principally one and two years old, to be sold by the said Milligan & McIlvane, as the agents of the said McGuire and Brush, under the following limitations: In con- sideration of the present value of said cattle, and the probable

increase by reason of growth and improved condition, and for other valuable considerations, the said Milligan & McIlvane are to assume all expense and charge of transportation, feed, pasturage and care of said cattle from and after the date of this agreement, and hereby agree to sell or otherwise dispose of said cattle on or before the first day of November, 1885, and hereby guarantee and agree, and by these presents bind themselves, their heirs, administrators, executors and assigns, to pay unto the said Edward McGuire and Samuel Brush, or their order, their heirs, administrators, executors or assigns, on or before the first day of November, 1885, the sum of thirty-four hundred and forty-four dollars ($3444), with interest at the rate of eight per cent per annum, from the date hereof until the same be paid—it being understood and agreed that any amount in excess of the above named sum, with interest at eight per cent per annum, from this date until the same be paid, arising from the sale of said cattle, shall be paid to and held by said Milligan & McIlvane, as their compensation, as agents, for freight charges, feed and pasturage, and all other expenses incurred on account of same until sold.

"It is further understood and agreed by said Milligan & McIlvane, that whenever any number or part of said cattle are sold by them, the proceeds of such sale, after deducting, *pro rata*, expenses and charges, is to be paid to the said McGuire and Brush, such payment to be entered on this contract as a credit, and when the sum of such payments shall amount to the aforesaid sum of thirty-four hundred and forty-four dollars ($3444), and accrued interest, then this agreement shall be cancelled, and the cattle remaining unsold, if any, shall become the property of Milligan & McIlvane.

"It is understood and agreed, that the said Milligan & McIlvane are, and shall act as, agents of the said McGuire and Brush, for the sale of the aforesaid cattle, and in case of the death, or inability to act, of either member of said firm of Milligan & McIlvane, then the surviving partner shall carry

out and execute the terms of this agreement; and further, if both members of said firm shall die, or be prevented by disability from carrying on their business before compliance with this contract, then the said McGuire and Brush, or their assigns, shall have the right to take possession of any or all of said cattle remaining unsold and unaccounted for at such time, and to sell the same to the best advantage, and apply the proceeds to the payment of the balance that may be due upon the contract, paying over the residue, if any, to the heirs or assigns or legal representatives of the said firm of Milligan & McIlvane.

"In witness whereof, the said parties have hereunto set their hands and seals, the day and year first above written.

Edward McGuire,      (Seal.)
Samuel T. Brush,      (Seal.)
Milligan & McIlvane,      (Seal.)

"It is hereby mutually agreed, that the within agreement, contract and agency, in all its parts, provisions and conditions, shall be, and it is hereby, renewed, prolonged and extended to and until the first day of September, A. D. 1886.

"In witness whereof, we, the parties to the within agreement, have hereunto fixed our hands and seals, this 9th day of November, A. D. 1885.

Edward McGuire,      (Seal.)
Samuel T. Brush,      (Seal.)
Milligan & McIlvane,      (Seal.)"

In the evening of the day in which the original contract was entered into, the cattle were shipped, in pursuance thereof, to Milligan & McIlvane, at Moawequa, by way of the Illinois Central railroad, McGuire accompanying them. On their arrival at Moawequa they were driven to what is known in that locality as the "Tanner farm," being the same upon which McIlvane was then living. The farm contained from four to five hundred acres in grass, and was used by Milligan

& McIlvane for pasturing and handling cattle. The first or second day after the arrival of the stock at the Tanner farm, McGuire, in company with Milligan, went over to the farm of the defendant, some twelve miles distant, in a north-east direction, where they met the defendant, took dinner with him, examined his pastures, cattle, etc. During the interview, McGuire informed him of having brought the two hundred and eighteen head of cattle to the Tanner farm, but nothing in particular seems to have been said as to their ownership, or the terms or conditions upon which they were put there.

Before the making of the contract above set forth, Milligan & McIlvane had entered into a somewhat similar one with Montgomery, in respect to the purchasing and pasturing of cattle. While that contract bears no date, yet Montgomery swears it was finally concluded on the last days of April, 1885. The contract, together with the one supplemental thereto, dated October 7, 1885, is as follows:

"Memorandum of agreement between L. E. Montgomery, of Springfield, Illinois, of the first part, and W. H. Milligan, of Pinkneyville, Illinois, and T. D. McIlvane, of Willeys, Illinois, known and doing business under the firm name of Milligan & McIlvane, party of the second part: Witnesseth, that the said Montgomery agrees to furnish the following described tract of pasture land, to-wit: The N. E. $\frac{1}{4}$ of sec. 23, S. E. $\frac{1}{4}$ of sec. 28, S. $\frac{1}{2}$ N. E. $\frac{1}{4}$ of sec. 28, W. $\frac{1}{2}$ N. W. $\frac{1}{4}$ of sec. 27, W. $\frac{1}{2}$ S. W. $\frac{1}{4}$ of sec. 27, Tp. 15, N. R. 2 W. of 3d P. M., Christian county, Illinois, and containing 440 acres, more or less, at the sum of $1200, and he is also to furnish five thousand dollars ($5000) in money, one-half by April 1, 1885, and one-half by May 1, 1885, to be used as follows: The said Milligan & McIlvain are to purchase five thousand dollars ($5000) worth of young, growthy, healthy cattle, to stock said pasture for Montgomery, to consume the season's grass on the same, and to act as selling agents for Montgom-

ery, said cattle to be marketed at the close of the grazing season, not later than December 1, 1885, to the best advantage. And it is further agreed, that said second parties are to receive and accept for their services in attending to said business for Montgomery, the profit that shall accrue from said deal after Montgomery shall be paid the sum of $1200 for said pasture, on or before December 1, 1885, with eight per cent interest after that date, till paid,—the sum of $5000 furnished to purchase said cattle, with eight per cent interest thereon for the time the same is used by said parties in said stock, and the sum of $750.10, with eight per cent interest thereon from March 1, 1885, being a balance due said Montgomery on a previous deal, provided the said stock brings so much. It is distinctly agreed between said parties, that the stock so furnished shall be the sole and absolute property of said Montgomery, and the said stock on said pasture shall be in his possession and in his control,—said second parties having put no money in the same, all the purchase money having been furnished by said Montgomery. And it is distinctly agreed, that if said cattle put upon said pasture do not bring the sum of $5000, with eight per cent per annum from the time said money is invested till said cattle are sold, or until December 1, 1885, also, the sum of $1200 for said pasture, to be paid December 1, 1885, that then the said parties of the second part are to be liable, personally, for such deficit, to said Montgomery, as the cattle are to be purchased and selected by them, and said Montgomery does not agree to be bound by the valuation placed by them upon said cattle; and all surplus, after making the payments herein above set forth, is to be the property of said second parties. All sales are to be made by and with the consent of said Montgomery, and the money to be first used in discharging the amount coming to him.                    L. E. MONTGOMERY.

                                   MILLIGAN & McILVANE,

SPRINGFIELD, ILL., *Oct. 7, 1885.*"

"It is this day mutually agreed between the parties to this contract, that Milligan & McIlvane are to remove one hundred and twenty-five (125) head of cattle to their former farm, situated in May township, in Christian county, Illinois, where they are to feed them corn in the best manner to cause them to fatten, for sixty (60) days,—the feeding to be done under Montgomery's direction; and this move is to in no way interfere with Montgomery's ownership and control of the cattle, as per tenor on this contract, of which this agreement becomes a part.

L. E. MONTGOMERY,<br>MILLIGAN & McILVANE."

In pursuance of the original contract between Montgomery and Milligan & McIlvane, first set forth, Montgomery advanced to Milligan & McIlvane the $5000 therein set forth, with which they purchased and placed upon his farm, to be pastured, one hundred and fifty-seven head of cattle. Under the supplementary contract of the 7th of October, Milligan & McIlvane took one hundred and twenty-five head of these cattle out of the pasture, to be fed and fattened, as therein contemplated. After they were thus prepared for market they were sold, and Montgomery received the proceeds, but just what he got for them he does not state. The remaining thirty-two of the one hundred and fifty-seven head were also sold for his benefit, and he admits to having received for them $1058.76, although he states himself "they were the tail of the lot." At the same rates the entire lot would have brought $5194.54. This lot of cattle was in Montgomery's pasture at the date of Milligan & McIlvane's contract with Brush and McGuire. On the 10th of October, 1885, Milligan & McIlvane, assuming that under their contract with Montgomery they had the right to do so, drove one hundred and thirty-one of the plaintiffs' cattle to Montgomery's place, and turned them in upon his pasture, for the reason, as stated by them, the grazing was better there, at that time, than on the Tanner

farm.   At the time of the extension of the plaintiffs' contract
with Milligan & McIlvane, in November, McGuire went over
to look at the one hundred and thirty-one head of plaintiffs'
cattle in Montgomery's pasture, though it does not seem that
anything in particular passed between him and Montgomery
in respect to the cattle being there, or the ownership of them.

It is claimed by Montgomery, that when he consented to
the taking of the one hundred and twenty-five head of cattle
out of his own pasture, it was understood that Milligan &
McIlvane were to replace them with others.   It is further
claimed by him, that when they placed the one hundred and
thirty-one head of plaintiffs' cattle in his pasture, as above
stated, he understood them to be put there in pursuance of
such understanding, and that he did not know, at the time,
that they belonged to plaintiffs, nor, indeed, that plaintiffs
had any claim upon them.   These claims of the defendant
are denied by the plaintiffs, and in this they are sustained
by both Milligan and McIlvane.   In the latter part of Novem-
ber, some controversy having arisen about the ownership of
these cattle, Montgomery caused them to be removed a few
miles distant, to Canney's place, where they were pastured
and cared for a short time, when Montgomery, as he admits,
took them (at least one hundred and twenty-eight of them,)
to Chicago, where he sold them, and appropriated the pro-
ceeds to his own use, as heretofore seen.   Omitting interest,
appellant's entire claim against Milligan & McIlvane was
but $6950.10.   He admits to have received on it, altogether,
$6165.66, which would leave only a balance of $784.44, ex-
clusive of interest, or thereabouts.

Messrs. Connolly & Mather, and Messrs. C. C. & Stuart
Brown, for the appellant:

As to Montgomery, who was without notice, the contract
between McGuire and Brush, of the one part, and Milligan &
McIlvane, of the other part, made the latter the owners of the

cattle, and Montgomery had the right to treat them as the cattle of Milligan & McIlvane. *Koch* v. *Willi*, 63 Ill. 144.

When the identical thing delivered is to be returned, it is a bailment, and the title to the property is not changed; but when there is no obligation to restore the specific thing, but only its value, it is a sale. *Lonergan* v. *Stewart*, 55 Ill. 49.

When the owner voluntarily parts with his goods, and clothes the purchaser with the *indicia* of ownership, title passes to a third party who has no knowledge of any condition attached to the former sale, or any fraud, if there be fraud. *Jennings* v. *Gage*, 13 Ill. 614; *Brundage* v. *Camp*, 21 id. 330.

If the owner has been deceived and defrauded into parting with his property, he can not reclaim it from one who afterward buys it in good faith. (1 Parsons on Contracts, 520.) The same, of course, would be true of one who is a mortgagee or pledgee in good faith.

If Milligan & McIlvane had actually sold these cattle to Montgomery in payment of a debt due from them to him, there can be no question that Montgomery would thereby obtain good title to the cattle.

Appellees had, as against the appellant, neither a right of property nor a right of possession in these cattle at the time of the commencement of this suit, in the spring of 1886. Both right of property and right of possession, as against the defendant, are necessary to maintain trover. *Eisendrath* v. *Knauer*, 64 Ill. 396; *Forth* v. *Pursley*, 82 id. 152; *Bertholf* v. *Quinlan*, 68 id. 297; *Owens* v. *Weedman*, 82 id. 409.

Milligan & McIlvane had a right to require him to account to them for the proceeds of the cattle, and pay to them any surplus remaining after paying him the sums mentioned in their contract with him, but that was the limit of their rights. As soon as they were placed in his pasture, they became a pledge to him for the payment of the money due him under

said contract, and he was entitled to hold them against Mc_Guire and Brush, as well as against Milligan & McIlvane.

Appellant had the right to prove what either Milligan or McIlvane said as to why they put the cattle in his pasture, and the evidence sought was material.

Mr. William J. Allen, for the appellees.

Mr. Justice Mulkey delivered the opinion of the Court:

No substantial reason is perceived for disturbing the judgment of the Appellate Court. To our minds the case is free from difficulty. On the trial in the circuit court, there was a sharp controversy as to two questions of fact, upon the decision of which it is manifest, from the evidence, as well as the instructions of the court, the case mainly turned. It was claimed by Montgomery, that the one hundred and thirty-one head of cattle belonging to appellees were put in his pasture by Milligan & McIlvane in part performance of their contract with him, and that at the time he received them, he had no notice of the fact that they were appellees' cattle, or that the latter had any claim upon them. On this hypothesis, the court, by a number of instructions, told the jury, that if the evidence sustained this claim of appellant, they should find for him. On the other hand, appellees contended that the cattle in question were placed on appellant's premises by Milligan & McIlvane, to be pastured, merely, without any understanding, purpose or intention, on their part, of delivering them to appellant, under his contract with them. The jury, upon this plain and simple issue, found for the appellees. In doing so, it is manifest that they must have found, as a matter of fact, either that the cattle were not delivered to appellant under his contract with Milligan & McIlvane, or that he, at the time they were placed in his field, had actual or constructive notice of appellees' ownership of them, for otherwise, under the instructions of the court, there would

clearly be nothing to sustain the finding of the jury. So far as the result is concerned, it is a matter of no consequence which of these facts was found in favor of appellees, for one is just as fatal to appellant's theory of the case as the other. With these questions of fact, of course we have nothing to do, nor with the evidence tending to prove or disprove them, except in its relation to the instructions.

Appellant makes the point, that to maintain trover it must appear that both the right of property and of possession were in plaintiffs, as against the defendant, at the time of the alleged conversion, and cites a number of authorities in its support. The rule contended for is, without doubt, the law. Indeed, it is so elementary in its character that the citation of authorities in its support was not at all necessary. Conceding the rule, as we do, we nevertheless fail to perceive that it presents any obstacle to the plaintiffs' right of recovery,—assuming, as we must, that the jury found the facts to be as claimed by them.

Appellant was examined as a witness, on the trial, in his own behalf. While so being examined, he was interrogated with respect to what he may have heard McIlvane or Milligan say about how they came to put plaintiffs' cattle in his field. On plaintiffs' objection, the court excluded the answer to the question, and this is assigned for error. We have no doubt of the correctness of the ruling of the court upon this point. The exact question propounded to appellant was this: "Have you heard either of them say how they came to put the one hundred and thirty-one head in there,—what they put them in under? If you heard either of them say, state." It will be observed that the declarations sought to be elicited by this question are not limited to any particular time or place. Had the inquiry been confined to what they may have said on that subject at the time the cattle were put into the pasture, it would doubtless have been a proper question. Declarations made by any of the parties at that time, expressive of the object of

putting the cattle into the pasture, would clearly have been a part of the *res gestæ*, and would have been admissible as such. But no such a case as that is here presented. By the question propounded it was sought to put in evidence the general statements of persons neither parties to the record nor in privity with those against whom they were sought to be used. This the rules of law governing the production of testimony forbid.

With respect to the instructions, we have no fault to find with the rulings of the trial court. If any error was committed, it was in the interest of the appellant, and consequently affords no ground for complaint on his part. Appellant's refused instructions, we think, were either not the law, or calculated to mislead the jury, and were, therefore, properly refused.

The judgment of the Appellate Court will be affirmed.

*Judgment affirmed.*