Argued May 2, decided May 24; rehearing denied June 14, 1910.

# STATE v. RYAN.

[108 Pac. 1009.]

CRIMINAL LAW—APPEAL—RECORD—CONCLUSIVENESS.

1. The record of the trial as certified by the judge is controlling on appeal in determining what were the rulings on objections to evidence.

CRIMINAL LAW—APPEAL—INVITED ERROR—RIGHT TO COMPLAIN.

2. Accused cannot complain of any action of the court which he invited.

CRIMINAL LAW—APPEAL—NECESSITY OF EXCEPTION—REMARKS OF TRIAL JUDGE.

3. Remarks of the trial court to which no exceptions were taken will not be considered on appeal.

HOMICIDE—EVIDENCE—ADMISSIBILITY.

4. Where, on a trial for murder in the first degree, the theory of the State was that accused intended to kill a third person, and not decedent, and the State showed that at the time of the killing decedent and the third person were together, and that accused was embittered toward the third person in consequence of trespasses committed by him on accused's land, evidence that, about two hours before the killing, accused armed with a gun, had a difficulty with the third person, and attempted to prevent him from crossing accused's field, was admissible to establish premeditation and deliberation essential to constitute murder in the first degree.

CRIMINAL ACTION—HARMLESS ERROR—ERRONEOUS ADMISSION OF EVIDENCE.

5. Where the court charged that, before the jury could consider any testimony as to experiments, they must find that the experiments were performed under substantially the same conditions, the error, if any, in admitting evidence of experiments made by witnesses as to the ability to see whether a person was armed with a gun, arising from the failure of the witnesses to select the proper place, was not prejudicial.

WITNESSES—IMPEACHMENT—CONTRADICTORY STATEMENTS.

6. Where a child of decedent testified on cross-examination that he had talked with his mother about accused shooting decedent, and denied that he had told her that decedent grabbed hold of accused's gun when the shot was fired, his testimony could be discredited by his mother acknowledging on oath that she had told a third person that the child had told her that decedent had grabbed the gun when the shot was fired.

WITNESSES—IMPEACHMENT—CONTRADICTORY STATEMENTS.

7. A witness may be impeached by proof of contradictory statements on laying the foundation therefor in the manner prescribed by Section 853, B. & C. Comp.

CRIMINAL LAW—ADMISSIONS—SILENCE.

8. Section 718, subd. 3, B. & C. Comp., authorizing evidence of a declaration or act of another in the presence and within the observation of a party, and his conduct in relation thereto, applies to a party to the record, or one identified in interest with him, and. excludes the conduct of a mere witness in respect to any declaration made or act performed

by another in his presence, and the fact that a witness made no response when a person stated in his presence that the witness had made a certain statement could not be shown to impeach him.

HOMICIDE—EVIDENCE—INSTRUCTIONS.
9. Where the evidence showed a previous difficulty between accused and the employer of decedent about two hours before the homicide, which was committed while decedent was accompanying his employer to the place of the former difficulty, a charge that accused should be acquitted if he honestly believed that his life was in imminent danger at the hands of decedent or his employer, and he was not an aggressor, etc., was not objectionable as leading the jury to understand that they could consider the previous difficulty.

CRIMINAL LAW—TRIAL—INSTRUCTIONS.
10. A charge in hypothetical form embodying the theory advanced by the State and shown by its evidence is proper.

From Umatilla: HENRY J. BEAN, Judge.

The defendant, Michael J. Ryan, was indicted for the crime of murder in the first degree, having killed Henry E. Dixon, and having been convicted of manslaughter, he appeals.                                    AFFIRMED.

For appellant there was a brief over the names of *Messrs. Lowell & Winter,* and *Mr. James H. Raley,* with oral arguments by *Mr. Stephen A. Lowell* and *Mr. Raley.*

For the State there was a brief over the names of *Mr. Gilbert W. Phelps,* District Attorney, and *Mr. Frederick Steiwer,* with an oral argument by *Mr. Phelps.*

Opinion by MR. CHIEF JUSTICE MOORE.

The defendant, Michael J. Ryan, was indicted for the crime of murder in the first degree, alleged to have been committed by killing Henry E. Dixon, and, having been convicted of manslaughter, he appeals. The theory of the State is that the defendant did not mean to slay Dixon, but that he intended to kill his victim's employer, Jacob Shubert, towards whom he was embittered in consequence of the latter's trespasses on his land.

It is deemed proper to describe the vicinity where the homicide occurred and to state the incidents that evidently induced it. It appears from a plat received in evidence that H. A. Neuner owned, in Umatilla County,

160 acres of land, adjoining which on the south and on the west are two quarter sections; the first being known as the defendant's "pasture" and the other as his "grain field." A lane, evidenced by wire fences, extends parallel with and four feet back from the south and the west boundaries of Neuner's land; the remaining eleven feet of the way being on the defendant's premises. Immediately north of the grain field mentioned is a farm owned by Shubert, who was in the habit of diagonally crossing Ryan's grain field to the angle of the lane. Joining Ryan's grain field on the south and his pasture on the west is another 160 acres, known as the "Dixie pasture."

The evidence introduced by the State tended to show that at dusk, a few days prior to the homicide, Dixon and his son Harry were hauling a tank of water across the grain field referred to, when Ryan, who was lying near the fence, suddenly rose and pointed a gun at them, but, discovering it was not Shubert, as he at first supposed, said: "It is a good thing you hallooed at your horses, or I would have filled you so full of lead you would not know who you were." The defendant then told Dixon to tell his employer that if he ever came through the grain field again he would shoot him, which threat Dixon transmitted as bidden.

It appears that Shubert left his farm, May 20, 1909, with a pair of small horses hitched to a light wagon, and drove to Milton, where he obtained twelve sacks of chopped barley. That evening near six o'clock, as he was returning and about to enter the east end of the lane, near Neuner's house, he saw Ryan pass into a house in his pasture, come out with a gun, and hasten towards the angle of the lane. Shubert tried to reach that point in advance of the defendant, but failed. When he came up, Ryan, pointing a gun at him, frightened one of the horses, compelling the driver to tie the team to a post in the south line of the fence. The defendant threatened

to shoot Shubert, told him Neuner's part of the lane was too narrow to drive on, forbade him to pass along the remaining width thereof, and ordered him to turn back. Declining to obey the command, Shubert left the team, saying, "I will see you later," and went north along the way and thence westerly to his house. Ryan thereupon put his gun into the wagon, drove the team north along the lane and up a hill, set the brake, and left the horses, hitched to the vehicle, to feed. He then returned with his gun to the northeast corner of the Dixie pasture, which he entered.

Dixon, his son Harry, and Shubert went that evening through Ryan's grain field to get the team, not knowing that it had been removed. They arrived at the corner of the lane about eight o'clock, but did not find the horses, although they discovered, by the light of a match, a wagon track at that place. They then saw in the Dixie pasture a dark object which they thought might be one of the horses recumbent; but upon approach it proved to be the defendant, who rose and, with levelled rifle, ordered them to stand back. The ground at that place sloped to the north so that Ryan stood above the others. Dixon was in front of Shubert, who, as the defendant moved to the right or left changed his position so as to make a shield of his employee. In this position Ryan discharged his gun; the bullet passing through Dixon's thigh and piercing Shubert's knee. Both men fell when injured; but, each rising, Shubert returned to his home, and Dixon wandered into Neuner's field, where his dead body was found the next morning.

1, 2. Shubert, as a witness for the State, in detailing the circumstances occurring from the time he returned to the corner, when it was quite dark, until the shot was fired, testified as follows:

"Mr. Dixon struck a match to see whether or not he could see any trace of where the team might have gone to,

and apparently there was a turn made at this corner. I then intended to go up the lane, and so we stood there talking about this. Mr. Dixon made the remark: 'The old man didn't seem to know he was laying himself liable for untying another man's team.' Then Mr. Dixon before I walked away and intending to go up the lane there looking for my team, he said: 'You better call out and see if, in case he is around here, what he done with your team.' So I called in a loud tone three times: 'Mike, what did you do with my team?' I done this three times in succession, but no reply was made, and as we stood and looked around Mr. Dixon observed a dark object. I should judge it was about here, designated by the letter 'E' (referring to a point on the map), that is to the best of my recollection, and he said: 'Let us go in here and see; maybe that is one of your horses.' So he took the lead, and I followed; went across the wires, went toward the object, and, as we were close upon the object, it rose up, gun pointed towards us, and proved itself to be the defendant, Michael Ryan. He hallooed: 'Stop! Or I will kill you.' The other man says, 'Put down that gun.' He says, 'We have no weapons and mean no harm.' Q. Who do you mean by the other man? A. Mr. Dixon. He says: 'Put down the gun. We mean no harm. We want to know what you done with the team.' He kept hallooing at the top of his voice, 'I will kill you,' and the other man kept telling him to put down the gun, and at the same time the defendant, Michael Ryan, was swinging in a north direction, that is, in this way, towards this way. And of course I was in back of Mr. Dixon and was swinging in the opposite direction, and moving at the same time around; and they continued to argue. As we had gone some distance that way, he made the remark to Mr. Dixon: 'You keep out of this. I have nothing to do with you.' We went on some time, and Mr. Dixon was arguing with the defendant to 'put down your gun. We mean no harm.' And he was shouting: 'I will kill you.' As we had gone a little farther, he said to him: 'Hide, you son of a blank, or I will kill you.'

Q. What did he say?

A. He said 'son of a bitch.' And just a little while after this, by shifting around a little farther, he continuously hallooing, 'I will kill you,' and Mr. Dixon said,

'Shoot away, then,' and as he said, 'shoot away then' the bullet came and went through both of us. We both dropped to the ground, and as we were on the ground Mr. Dixon, he threw himself forward on the ground, apparently trying to reach the defendant by the leg and did not reach him. And Mr. Dixon got up, walked just about in the same direction as we came in; in that direction to the best of my knowledge—that is, in a northeasterly direction—he walked away from the scene of the shooting."

The theory of the defendant's counsel is that, after taking the team up the hill, Ryan returned to the northeast corner of the Dixie pasture, where he had left a sack containing a small quantity of poisoned wheat, which he had been using to kill squirrels; that, as he was groping in the darkness for the sack, he heard voices of persons approaching in his grain field; that, having reached the corner, they came towards him, whereupon he repeatedly told them to go back; that they persisted in advancing, and Dixon, who was a powerful man, grasped the gun; that the defendant had a paralyzed arm, and, a struggle ensuing, the weapon, which had been taken that afternoon to hunt for coyotes, was discharged.

The defendant, as a witness in his own behalf, referring to the southeast corner of his grain field and to the incidents occurring thereat on the night of May 20, 1909, testified as follows:

"They came up, and when they came to the gate this man Dixon said, 'Why, the damned son of a bitch (meaning the witness) has the gate locked,' and he looked and said, 'Halloo,' and I knew he didn't see anything, and I didn't say anything. And they got out a light, a match, and examined. So finally they turned. I don't know who did see me there, and they came back. As they came back, they stopped at the fence, and they asked me what I did with the team. 'I didn't do anything with your horses,' says I. 'There is one of them,' they says, 'Shubert was driving, was mine.' I said: 'That team has started up the hill. You will find them on top of the hill.'

He (probably meaning Dixon) came through the fence
now, and he says: 'You are not on your own ground,
and you bluffing son of a bitch, you can shoot.' I jumped
up. I said: 'Keep away! You don't know whether I am
on my own ground or not. I don't want any trouble with
you.' They came between me and the fence.

Q. When you say 'they,' who do you mean?

A. Dixon and Shubert and a little boy.

Q. Go on.

A. They made a half moon above me. They kept
crowding on me all the time. He rushed on, and I said,
'Don't come any farther.' He was then within distance
where he could reach the gun, and he said, 'You bluffing
son of a bitch! you shoot!' and put up his hand and
grabbed the gun and leaned up in this position. The big
tall fellow (Dixon) grabbed it from me, and the shot
went off. We nad a tussle for it, and he grabbed my feet,
and I threw him to the ground, and before he gets his
knees off the ground I flipped up his hands and he jerked
loose. He says : 'ʊ! You son of a bitch!' I jumped out
a ways from him and I threw the empty shell out, and
something got the matter with the other one. I jerked it
up again, and the next time I threw it up again it was
all right; it worked. I seen this Shubert drop down.
Then, after all this passed—play possum. Jumped down
and jumped up as quick and said: 'O my God! I am shot!
I die! I die!' He was through the fence before Mr.
Dixon was."

On cross-examination the defendant, referring to Shu-
bert's return to the angle of the lane on the night of the
homicide, stated upon oath:

"I think he came back with a brave man all right. I
am sorry he was such a fool.

Q. You told that fool that you were not looking for
him, didn't you?

A. Yes, sir; I was not looking for either of them. I
had a good shot there, and I knew it."

Alluding to the approach of Shubert and Dixon, Ryan
testified:

"Yes, sir; they were coming towards me. You could
distinguish better when they were coming towards me
lying down that way than if I were standing up."

The defendant, referring to Shubert's actions immediately after the gun was discharged, further said: "Yes, sir; he never fell. I asked this man Dixon, 'Are you satisfied?'"

Considering the exceptions relied upon for a reversal of the judgment, Shubert, as a witness for the State, having detailed the circumstances of the killing, was asked on cross-examination, "How do you account for the fact, if the shooting was downhill at you, the bullet came out higher up than when it entered?" An objection to the inquiry interposed by the district attorney was overruled, and an exception allowed; the court saying evidently to the prosecuting officer: "He may state, and you may inquire in regard to the position. I think this question should be left to the jury." The bill of exceptions shows that the defendant's counsel, after securing this ruling in their favor, did not insist upon an answer. They contend, however, in their brief, that an error was committed in sustaining the objection. The record of the trial as certified by the judge is controlling in the particular noted and shows that the order was made to benefit the defendant, who cannot be heard to complain of any action of the court which he invited: *Caldwell Banking & T. Co.* v. *Porter*, 52 Or. 318, 331 (95 Pac. 1: 97 Pac. 541).

3. Shubert's sworn declarations regarding the occurrences leading up to the dispute between himself and Ryan early in the evening of May 20, 1909, were substantially corroborated by Neuner. The defendant's counsel, in order to discredit such evidence, called witnesses who severally testified that about noon of a clear day in September, 1909, he assisted in determining whether or not a large Winchester rifle, such as that used at the time of the homicide, carried by a person from Ryan's house to the corner of the lane, could be seen from the point occupied by Shubert and Neuner when,

as asserted by them, they saw the defendant with the gun, and each of the witnesses acknowledged that, he could not observe the weapon. Three of such tests were made: The first at the angle of the lane; the second east thereof; and the third in front of Neuner's house. One of them, however, admits that he saw a flash as the sunlight was reflected by some bright object, either worn or carried by one of the witnesses participating in the experiment.

The State was permitted, over objection and exception, to introduce testimony in rebuttal to the effect that in October of that year a similar test was made about noon of a fair day, and each witness declared upon oath that the weapon so conveyed could be seen from the point of observation in the lane. The defendant's counsel moved to strike out all such rebuttal testimony on the ground, *inter alia*, that the point so selected by such witnesses was not the place designated by Shubert and Neuner. The court, replying said: "As to the place Neuner and Shubert say they saw the gun, you may discuss to the jury. The motion is denied"—to which ruling an exception was allowed. It is maintained that in receiving the testimony so objected to, and in refusing to strike it out, the State was allowed to contradict immaterial sworn statements to the prejudice of the defendant, and that the remark of the court last quoted tended to create in the minds of the jurors a doubt respecting the testimony of Shubert and Neuner in relation to their point of observation when there was no dispute concerning the same. No exception was taken to the court's remark, and for that reason anything that was thus said will not be considered.

4. It will be remembered that the indictment charged murder in the first degree. If Ryan was seen hurrying with a gun to prevent Shubert from crossing his grain field, and a difficulty arose, the possession of the weapon

would tend to establish premeditation and deliberation, which were ingredients of the accusation. Any testimony therefore, relating to the defendant's planning for the encounter, was material and admissible.

5. The experiments made by witnesses for the respective parties would be of little probative force unless the tests were conducted from the place so occupied by Shubert and Neuner on the evening of the homicide. Shubert, in speaking of that point and referring to the plat mentioned, said. "I met Mr. Neuner in the lane about here," without placing on the map any mark or giving any distance from a fixed object to show what point he had in mind. Neuner testified on this subject as follows: "I was about 200 feet off from my house where I fixed the gate when Mr. Shubert came along past my house. * * As he drove up I went to this corner." The only angle represented on the map as being near Neuner's house is the northeast corner of Ryan's pasture. It is impossible to locate, with any degree of certainty, from a careful reading of the transcript, the place from which the defendant was first seen carrying the gun. So, too, it cannot be determined whether or not the northeast corner of Ryan's pasture was selected by the witnesses who thus testified in rebuttal as the place from which their test was made. Reference is made by them to a field of barley at the corner of which their experiment was conducted, and from which a line of fence is projected; but we have been unable definitely to locate this point. If an error was committed in receiving such testimony, it cannot be ascertained from an inspection of the record. We do not think any prejudice could have resulted, for the court, referring to the distance a gun could be seen when carried by a person, instructed the jury in effect that, before they could consider any testimony in respect to the experiments, they must first find that the tests were performed under substantially the same conditions,

and, as the map was before the jury, they undoubtedly were aware of the several points indicated thereon by the witnesses.

6. Harry Dixon, who at the time of the trial was eight years old, as a witness for the State, having testified on cross-examination that he had talked with his mother about seeing the defendant shoot his father, was asked, "Did you at any time tell her that your papa grabbed hold of the gun?" referring to the weapon which Ryan used when he fired the fatal shot, and the witness replied, "No, sir." He also stated upon oath that after the homicide he went with his mother to visit Frank Dickerson, a neighbor, and there partook of dinner, but was playing with Dickerson's boys and did not eat with the other members of the family. The defendant's counsel thereupon inquired:

"I will ask you if at that time and place, and those persons being present, if Mr. Dickerson did not say in your presence, while you were there, that he had just been to Pendleton, and that Ryan claimed that Dixon had grabbed the end of the gun when the shot was fired, and didn't your mamma reply then, and say, 'I have never told anybody but you, but that is what Harry told me when he came home that night,' or words to that effect?"

An objection to this question was sustained and an exception saved. Frank Dickerson, the person referred to, having testified that soon after the homicide Mrs. Dixon and her son Harry dined at his house, the query last hereinbefore quoted was asked him. An objection interposed by the district attorney was sustained and an exception allowed. The defendant's counsel then stated to the court:

"If permitted to answer, the witness would say 'Yes,' and would further say that Harry was at the table and did not deny his mother's statement."

7. Harry Dixon might have been impeached by evidence that he had previously made statements inconsistent with

his testimony at the trial; the foundation therefor having been laid in the manner prescribed. Section 853, B. & C. Comp. His testimony could have been discredited if his mother had acknowledged upon oath the language sought to be imputed to her by Dickerson; but she was not called for that purpose.

8. Our statute asserts, *inter alia,* that evidence may be given at a trial of the following facts: "A declaration or act of another, in the presence and within the observation of a party, and his conduct in relation thereto." Section 718, subd. 3, B. & C. Comp. It will thus be seen that it is a party to the record in an action, suit, or proceeding, or one identified in interest with him whose admissions, by silence and acquiescence, are receivable in evidence. 1 Am. & Eng. Enc. Law (2 ed.) 675; *Stowell* v. *Hall,* 57 Or. —— (108 Pac. 182). Such limitation necessarily excludes the conduct of a mere witness in respect to any declaration made or act performed by another in his presence. In *Kilburn* v. *Ritchie,* 2 Cal. 145, 148 (56 Am. Dec. 326), Mr. Chief Justice LYONS, in discussing this question, says:

"It is well settled that the declaration of third persons, not parties to the record, cannot be admitted in evidence, except in those cases where they have a joint interest with the plaintiff or defendant, or where some legal relation, such as that of partners, exists."

To the same effect, see *Luck* v. *Robinson,* 30 Ga. 55, 59; *Montgomery* v. *Brush,* 121 Ill. 513, 524 (13 N. E. 230); *Ibbitson* v. *Brown,* 5 Iowa, 532, 534; *Faulkner* v. *Whitaker,* 15 N. J. Law, 438, 440. An exception to this legal principle seems to exist in cases in which the admissions of strangers to an action or suit are admissible when the issue substantially involves the material rights of such persons at a particular time. 1 Green. Ev. (14 ed.) § 181. This deviation from the general rule, however, can have no application herein for Harry Dixon is not a party to

this action, nor is he identified in interest with the State or the defendant, and, such being the case, evidence of any conduct sought to be ascribed to him in consequence of his failure to deny a statement asserted to have been made in his presence and hearing was inadmissible, and no error was committed in rejecting that part of Dickerson's testimony.

9. It is maintained that errors were committed in giving the following instructions, to which exceptions were taken, to-wit:

"The law guarantees to every man the right of self-defense. This means that a man may defend his life and may defend his person from great bodily harm. He may repel force by force, and he may resort to such force as, under the circumstances surrounding him, may reasonably seem necessary to repel the attack made upon him; and in his defense he may even go to the extent of taking the life of his adversaries or either of them. The right of self-defense is founded upon the law of nature, and is not and cannot be superseded by the law of society. Hence, if the jury finds, from the evidence in this case, that Shubert and Dixon were acting together or making a simultaneous attack upon the defendant, and that the defendant at the time he fired the fatal shot and killed the deceased, if he did fire it, had reasonable grounds to believe, and did honestly believe, that his life was in imminent danger, or that he was in danger of great bodily harm at the hands of the deceased or Shubert, and not being the aggressor, and so honestly believing, he fired the fatal shot, he was justified under the law and should be acquitted. And by 'agressor' I mean one who brings on a conflict or affray by some overt act or demonstration, calculated to precipitate the difficulty or conflict.

"I instruct you that, before you can acquit the defendant on the ground of self-defense, you must find that the defendant did not bring on and provoke the difficulty with Shubert or Dixon, the deceased, for the purpose and with the expectation of causing Shubert or deceased to assault him, and to thereupon kill him, and in this connection I charge you that if you find from the evidence beyond a reasonable doubt that the defendant intercepted Shubert

at a time when he was on his way to his home, and caused by force or violence, or by threats of force and violence, Shubert to leave his team along the road at a place near where the trouble afterwards occurred, and if you further find beyond a reasonable doubt that the defendant then hid and laid in wait with the expectation that Shubert would return for his team and would seek him, the defendant, and advance toward him, either alone or accompanied by Dixon, and if you further find beyond a reasonable doubt that in this manner the defendant sought out and intentionally provoked the difficulty, then I charge you that, before the defendant could avail himself of the law of self-defense, he must have retreated or withdrawn or attempted in good faith to have withdrawn from the conflict."

It is argued that by the use of the expression "aggressor," as employed in the part of the charge first set forth, the jurors must have understood that they could consider the difficulty which occurred at the angle of the lane between Ryan and Shubert early in the evening and determine who made the first attack, and that the failure to limit the word "aggressor" to the time of the final encounter was an error. An examination of this part of the instruction will show that preceding the phrase, "and not being the aggressor" appears the clause, "at the time he fired the fatal shot," the use of which unquestionably limited the application of the word "aggressor" to the immediate occasion of the shooting. The definition of the term complained of was evidently copied from an instruction given in the case of State v. Gray, 46 Or. 24, 27 (79 Pac. 53), where the use of the word, under similar circumstances, was approved. No error was committed in giving this part of the charge.

10. The instruction last quoted placed before the jury the theory of the district attorney that, Shubert having said when he left his team at the angle of the lane, "I will see you later," the defendant expected him to return; that it did not require two hours and a half, or from 6

o'clock in the evening, when Shubert drove his team to the corner of the way, until 8:30 that night, the time of the encounter, as admitted by Ryan, for him to drive the horses north a half-mile and return that distance; that armed with a loaded gun he waited the arrival of the persons whom he heard approaching at a time when he said it was very dark; that he could see Dixon and Shubert; that he knew he had a good shot from his reclining position; and that after Dixon fell his malice was so great that he inquired of his victim, "Are you satisfied?" The last instruction, having been put in hypothetical form, embodied the theory adverted to, and no error was committed in thus charging the jury.

Other alleged errors are assigned; but, as they are not discussed in defendant's brief, and as they are deemed unimportant, they will not be considered.

It follows that the judgment should be affirmed, and it is so ordered.                                             AFFIRMED.

