Argued July 10, reargued October 14, reversed and remanded December 23, 1919.

## STATE v. RADER.*

### (186 Pac. 79.)

**Homicide—Attorney's Advice to Deceased.**

1. In the absence of evidence showing an attempt to dispossess him of the premises where he was killed, the advice of an attorney given to the decedent about the validity of his tenure is collateral and immaterial.

**Refusal of the Defendant to Submit to Arrest.**

2, 9. A statement made by the defendant the next day after the homicide to the effect that he would not permit a deputy sheriff to take him and that he was not afraid of the law is incompetent and cannot be used against him, in the absence of showing that he attempted to resist arrest.

**Evidence—Impeachment of Witness—Letter Used must be Pertinent.**

3, 10. A letter written by a witness and pertinent to the case in hand may be introduced in evidence for the purpose of disclosing the degree of interest the witness has in the result of the trial; but it cannot be used against the defendant for any other purpose unless it is shown to have been written by his authority or consent. If it is not shown to be pertinent to the case it cannot be used in evidence for any purpose.

*On general and common-law rules relating to homicide in the commission of felonies, see note in 63 L. R. A. 354.    REPORTER.

### Homicide—Self-defense—Intent of Assailant not Controlling.

4, 12.  It is erroneous to instruct the jury in a homicide case that "if the intention of the assailant is only to commit a trespass or simple beating it will not  justify the killing," because the right of self-defense is not controlled by the intention of the assailant.  The assailed may act upon appearances.

[As to homicide in self-defense, see note in 26 Am. Dec. 279.]

### Evidence—Inferences.

5.  "An inference *must* be founded on a fact legally proved *and* on such a deduction from that fact as is warranted by a consideration of the usual propensities or passions of the person whose act is in question, the course of business or the course of nature": L. O. L., § 796.  It is error, therefore, to instruct the jury that an inference *may* be founded either on such a fact or in the alternative upon a deduction therefrom.

### Homicide—Self-defense—Uncommunicated Threats of Deceased.

6.  The decedent's threats of violence against the defendant, although not communicated to the latter, are admissible in evidence to aid the jury in determining who was probably the aggressor in the fatal affray, and on request the defendant is entitled to an instruction informing the jury of this principle.

### Homicide—Self-defense—Retreat.

7.  A defendant is not bound to retreat from a place where he has a right to be when he is unlawfully assaulted; but may stand his ground and defend himself against the attack.

### Homicide—Self-defense Proportionate to Danger.

8.  It is essential to the right of self-defense that it be not excessive nor disproportionate to the force actually or apparently involved in the attack upon the defendant, all to be judged by the jury from the standpoint of a reasonable man in the situation of the defendant at the time under all the circumstances surrounding him.

### Evidence—Mental Attitude of Defendant.

11.  On his way to the scene of the homicide where he had reason to believe the decedent then was in possession under claim of right the defendant offered to sell to a third party the grass on the land where the decedent then was.  This fact was proper for the consideration of the jury in determining the mental attitude of the defendant towards the deceased.

### Homicide—Self-defense—Felony—Great Bodily Harm.

13.  Violence to the person which amounts to no more than the misdemeanor of simple assault and battery does not justify taking life; but a person is justified in slaying to avert imminent danger of violence amounting to a felony.  Violence of the degree of felony is "great bodily harm," but that which amounts only to a misdemeanor is not "great bodily harm."  It is not error to charge the jury that "the danger must be that of a threatened felony" before the defendant may kill his assailant in self-defense.

94 Or. —28

From Grant: DALTON H. BIGGS, Judge.

In Banc.

On an indictment charging him with murder in the second degree by killing E. E. McCue the defendant was convicted of manslaughter and appealed.

REVERSED AND REMANDED.

For appellant there was a brief over the names of *Mr. Errett Hicks, Mr. John L. Rand* and *Messrs. Winter & Maguire,* with oral arguments by *Mr. John P. Winter* and *Mr. Robert Maguire.*

For the State there was a brief over the names of *Mr. James A. Fee, Mr. George M. Brown,* Attorney General, and *Mr. Phillip Ashford,* District Attorney, with oral arguments by *Mr. Fee* and *Mr. Brown.*

BURNETT, J.—Substantially the facts disclosed by the evidence are these: The defendant is a man about thirty years of age, weighing about one hundred and eighteen pounds. He had ridden on the range after stock since he was a small boy, and had been dragged by a horse, injuring him severely and breaking his ribs. His arm had been broken and one of his legs had been fractured in two places. The deceased McCue was a man described in the testimony as weighing about two hundred pounds, well formed and muscular. The defendant attended to business for his father, who was a stock-raiser and owned the premises where the homicide occurred. It was known as the Johnson ranch and had been leased to a man named Stubblefield, who had assigned the lease or sublet the same to McCue. Contending that the tenant's transfer was void, the senior Rader had been

endeavoring to get McCue off the place and had caused the defendant to serve upon him a notice to quit. No litigation on the subject is revealed by the testimony. In addition to this there was an unsettled account between McCue and Rader respecting the use and occupation of the Johnson place and some witnesses say that McCue admitted owing a balance to Rader, which he promised to pay, without admitting any certain amount. Some time in the autumn of 1917 he had vacated the Johnson place and taken up his residence in Malheur County. On his way, the defendant sought to collect the balance from him and he promised to pay when he returned. He came back in February, 1918, and brought with him some horses to which he intended to feed some hay left on the Johnson place.

On the day of the homicide the defendant was at what is known as the Wright place, some distance northerly from the scene of the tragedy. A neighbor, Mr. Hale, came along on his way to the town of Long Creek, which was still farther south than the Johnson place, and asked the defendant to accompany him to Long Creek, to which the defendant assented. The latter took with him an automatic pistol in the pocket of his chaps, also a rifle which he carried in a scabbard attached to his saddle. Both Hale and the defendant traveled on horseback. Before he reached the Johnson place the defendant dismounted, took the rifle from its scabbard and carried it across the saddle in front of him after remounting. He explains this change of its position by saying that he was afraid of one Guy Lunceford, who was in the immediate vicinity and with whom he had had some trouble before. He explains carrying both firearms by saying

that it had been his habit for several years while riding in the livestock business and that it was customary among range riders in that country to carry firearms for the purpose of shooting wolves and other predatory animals, and that he had been riding after stock within the previous day or two.

On arriving at the house on the Johnson place, a one-room cabin described as being fourteen by sixteen feet in dimensions, he said to Hale in substance that he wanted to see McCue for a moment, and went into the house, carrying the rifle on his arm. After a few minutes he reappeared at the door and invited Hale to dismount and come in to warm himself, as the day was very cold. Hale went in and found the defendant with his rifle still on his arm, and rolling a cigarette. After having been introduced to McCue, the conversation proceeded upon indifferent subjects, without any appearance of anger, until Rader asked McCue, "What are we going to do about this business?" and the latter answered, "I ain't going to do a damn thing about it," took up a pan that was on the stove and slammed it on a bench. At this point Hale, apprehending trouble, left the cabin and mounted his horse. Soon afterward he heard considerable noise as of a struggle in the house, and the defendant called to him for help. Hale at once dismounted, re-entered the house and found that McCue had the defendant prostrate on the floor, face downward, and was "churning" his head upon the floor. Hale intervened by telling McCue to let him have Rader and he would take him away. He says in substance that he was compelled to lift Rader from the floor, grasp him under one arm and place the other over his shoulder and that he had dragged him around and while he was

in a half reclining position in Hale's arms they reached the door, when McCue made a dive at Rader and either struck at him or grabbed at him, saying, "You son-of-a-bitch, I will learn you something!" At this juncture Rader, who had said nothing nor made any demonstration since Hale re-entered the house, fired his pistol twice in quick succession. These shots took effect in the abdomen of McCue. Hale found the rifle lying on the floor. It was not fired during the melée. Hale released Rader at the discharge of the pistol and started in pursuit of their saddle-horses, which had run away. On his return he found McCue lying on the bed in the southeast corner of the room. The dying declaration of McCue indicates that he went outside of the house and returned at once to his bed. In this he is corroborated by the defendant.

The defendant's narration of the affray is to the effect that when he went into the house to see McCue there was no ill feeling manifested and nothing hostile occurred until he asked McCue what he was going to do about the business and the latter replied as stated. He says that he had set his rifle down by a small cupboard in the corner and was looking out of the west window when suddenly, without warning, McCue leaped upon him and struck him several severe blows, rendering him at least partially unconscious; that he was engaged in beating him when Rader called to Hale for help, and that it was not until McCue had renewed the attack upon him while he was still in Hale's arms that he fired, taking the pistol from his pocket. Rader and Hale immediately procured help and summoned a surgeon, who operated upon the decedent, but the latter died the following day.

The dying declaration of the decedent is the only other evidence about the details of the fatal affray. As narrated by the surgeon, McCue said:

" 'Fritz [meaning the defendant] came in here hunting trouble, with his gun and I knocked him down trying to get his gun away from him.' Mr. Hale came in—first—I think he said Hale—he said that—'Hale was going to take him out so he wouldn't bother me.' Fritz began shooting, twice in the house and two or three times outside, he didn't remember, McCue didn't remember just how many times he shot outside. 'He knocked me down and then I think there was two shots.' One shot outside knocked him down, and then he shot him through the head and arm. I don't remember just the exact words, but that is as near as I can remember."

Another witness, Charles Lunceford, attributes these words to McCue in his dying declaration:

"He came in and started trouble. I saw he was going to use his gun, and I hit him and knocked him down and got his gun away from him, and would have got his pistol away and made it all right, but the other fellow came in [and had reference to Hale], and said he would take care of him, and he took him and started out with him, and he shot me twice in the stomach, and I started towards him, and outside I fell, and he shot me in the head and arm after I was down."

George Baird and Norman Caverhill give substantially the same account of the declaration.

In addition to the wounds in the abdomen there was another in McCue's right arm, and a fourth through the head from temple to temple. Rader's account of the wound in the head and arm is substantially that when Hale fled at the beginning of the shooting, the defendant found himself lying on a little platform in front of the door, with McCue bending

over him, whereupon he shot upwards from his recumbent position, inflicting the wounds as stated and that McCue turned around and walked away from the house and called for help, when Rader told him he would help him if he would quit, whereupon McCue returned to the house and laid himself on the bed.

On behalf of the defendant, S. J. Cardwell testified to meeting the decedent driving the horses on his return from Malheur County, and further gave evidence as follows:

"Q. You may state, Mr. Cardwell, what that conversation that you had with him at that time was.

"A. Well, perhaps I couldn't state it all, but then I could state a good part of it, anyway. When we met we passed the time of day and I says, 'You are going back, are you?' 'Yes,' he said, he was coming back, and he said he was coming back over to feed out his hay if it wasn't destroyed. I asked him if he had any pasture and he said no, that the fence was all down, and I asked him if he wasn't afraid to go back down there that way—I don't remember whether I said, with his horses, or just asked him if he was afraid to go back down there that way. He said no, that he had come back to fight them sons-of-bitches the rub, and he said—I don't know just exactly—I think he said there had been one little gun play made, and he said the trouble of it was that—he didn't say Fritz—he said that he always brought some son-of-a-bitch with him when he came.

"Q. Did he say anything about making the smoke fly?

"A. Yes, sir.

"Q. What did he say about that?

"A. He said there had been one little gun play made, and the trouble of it was he always brought some son-of-a-bitch with him. He said that he came up one day, Fritz did, with a pistol around his waist and one on the horn of the saddle, and he said they had quite a set-to. He said he reminded him of a gun that

he had, in their talk, he said he had an envelope that he had laid down or lost it—I think he said laid down —at the farthest end of the stack—I don't know where the stack was at or anything. It had some figures on it, and he said that Fritz put the spurs to his horse when he started after that. I asked him which way he went, from him or towards him. He said, not either, he said he went kind of sideways— or angling—I don't know his words exactly; one or the other. He says, 'The next gun play that is made, the smoke is going to fly.' That is about the words that he said.

"Q. He referred to whom when he referred to them as 'sons-of-bitches'?

"A. He didn't say who, only in his words, I remember him speaking of Fritz; he said Fritz was a harder man to get along with than George, in some speech, some part of his speech there."

A. T. Meyer narrates a conversation with McCue as follows:

"I told him that I heard Mr. Rader tell Fritz to go down and tell him that he didn't want him on the place. He says, 'Well, if he ever bothers me he will get hurt,' in a very menacing manner."

J. A. Steach stated as a witness that on his return from Malheur County McCue had a conversation with him which the witness reports as follows:

"Then he spoke about coming back, and I understood him to say that the hay was undivided, and he said that he was out at the place and that old George Rader—that is the words he used—had cussed and abused him out at the threshing-machine in the field and he had stood that abuse, but he said he wouldn't stand any more, and he said, if Fritz Rader came onto that place he would kill him."

Another witness, Paul Barr, speaking of McCue, testified thus:

"Well, sir, he said if Fritz Rader tried to drive them horses out of there it would be the last time he would ever drive horses."

It does not appear that any of these threats imputed to McCue were ever communicated to the defendant.

It is assigned as error that Charles Lunceford was permitted to testify that he talked with the defendant just prior to the latter's arrival at the Johnson place and negotiated with him to buy the grass on that ranch and that the defendant first refused but finally said he could have it for $250. The defendant also complains of a ruling of the court allowing an attorney to testify that he had advised McCue that he had a right to remain on the Johnson place under the transfer from Stubblefield. Another ruling which the defendant attacks is the admission of testimony that the next day after the homicide the defendant had stated he would not permit any deputy sheriff to take him and would not allow any John Carter to be fooling around him, and, further, that he was not afraid of the law.

Mrs. Meyer, the defendant's sister, was called as a witness for the defense to impeach the attending surgeon by relating a statement made by him contrary to his testimony at the trial. On cross-examination she admitted that she was considerably interested in the case because it was that of her brother and that she had been trying to get witnesses to tell the truth. The prosecution then offered a letter written by her under date of May 18, 1918, addressed to Mr. E. Barr, importuning him to come out with a statement and confession on behalf of her brother. After some language urging him in that line, the letter contains this statement:

"If you will do this, the whole country will applaud you and you can give yourself a higher standing than

you have ever had before, and I will say further you will be financially placed above want."

Among others, the court gave to the jury the following instructions:

"Before a person is justified under the law of self-defense in taking the life of another, it must appear, first, that the danger is actually or apparently imminent; and by imminent danger is meant an immediate danger, one that must be instantly met, and which cannot be avoided by reasonable efforts to prevent it; and second, the danger must be such that the defendant believes and has good reason to believe that he is in danger of losing his life or of great bodily harm; the danger must be that of a threatened felony. Third, he must use only such force as must be necessary, or honestly appear to him to be necessary at the time, to protect himself from such imminent danger.

"By 'great bodily harm' is meant more than a mere injury by the fist, such as is likely to occur in an ordinary assault and battery. The injury apprehended must be more severe and serious than that usually inflicted in an ordinary fight with the fists, without weapons. Fear of a slight injury is not sufficient. Nor will a mere assault, not felonious, furnish an excuse for the taking of life. If the intention of the assailant is only to commit a trespass or simple beating, it will not justify his killing. But you may consider the relative size and strength of the parties and the ferocity of the attack in determining whether the intended beating, if any, was of such a character as to endanger life or limb, and if so, it will then be felonious and the assaulted person is justified in taking the life of his assailant, if necessary, to preserve his own person or to protect him from such felonious beating.

"Indirect evidence is of two kinds: inference and presumption. An inference is the deduction which the reason of the jury makes from the facts proved, without an express direction of law to that effect, and it may be founded on a fact legally proved, or on such a deduction from that fact as is warranted by a con-

sideration of the usual propensities or passions of man, the particular propensities or passions of the person whose act is in question, the course of business, or the course of nature."

The trial judge refused, among others, the following instructions requested by the defendant:

"If you find from the evidence that E. E. McCue, previous to the time he was shot, had made threats to kill the defendant or do him bodily harm, you have the right to take this into consideration, who was the aggressor.

"There has been some testimony in this case tending to show previous threats made by the deceased that were not communicated to the defendant. I instruct you that such threats, if you find there were any, should be considered by you in determining the feeling and intent of the deceased toward the defendant at the time of the encounter and as a circumstance to be considered by you as to whether or not the deceased so acted at the time of the shooting as to induce in the mind of the defendant an honest belief that the said E. E. McCue intended to kill him or do him great bodily harm.

"I instruct you that when a man is where he has a right to be, retreat is not necessary and he is not bound to retreat until his back is at the wall, as is the old saying, but he may stand his ground and repel the attack and meet force with force if necessary, even to the extent of taking the life of his adversary."

1. The matter about Lunceford's endeavor to buy the pasture and the attorney's advice to McCue about the validity of his tenure of the place were collateral matters which should have been avoided, as they neither add to nor take from the guilt of the defendant. There is nothing in the evidence to indicate that the defendant attempted to dispossess the deceased of the premises at the time of the homicide. If the deceased had been a defendant who had slain the pres-

ent defendant while the latter was endeavoring to eject him from the land, he might have shown that he was rightfully there and had reason to believe in the justice of his possession, as tending to show that he was defending his property, but the converse is not necessarily true.

2. In principle, the testimony about the defendant's saying the next day that he would not permit a deputy sheriff to take him, etc., is governed by *State* v. *Meyers*, 57 Or. 50 (110 Pac. 407, 33 L. R. A. (N. S.) 143). In that instance the defendant had killed a police officer while the latter had him under arrest and in the nature of relating a previous threat made by the defendant, a witness was allowed to say, "He said, 'If they arrested me like that fellow was arrested, I would shoot them,' " alluding to the arrest of another party that had been made previously. The court said:

"It was a casual remark made several months before, and evidently did not refer to deceased. Nor was it shown to have referred to policemen or arresting officers as a class. The evidence was too remote to have any legitimate bearing upon the case at bar. * * The admission of this testimony was highly prejudicial to defendant, and was reversible error."

If in the Meyers case it was prejudicial to the defendant to admit a statement of the kind, not alluding to the deceased in person or as a member of a class, although made before the homicide, much more is it prejudicial in the present case to allow such a statement, manifestly not alluding to the decedent and made after the homicide.

3. It was also error to admit the letter written by the defendant's sister to Barr. There is nothing in the language of the letter indicating that it referred

to the present case or that Barr was expected to testify in this litigation. She had admitted her interest and explained the reason. Moreover, there is not a syllable of testimony indicating that the defendant knew about the letter or authorized his sister to write it. In *People* v. *Dixon,* 94 Cal. 255 (29 Pac. 504), it was set down as harmful to the defendant to allow a witness to testify to acts and declarations of third parties in the absence of the defendant and unauthorized by him in attempting to influence the witness to leave the country so as to avoid testifying in the case. In *State* v. *Day,* 22 Or. 160 (29 Pac. 352), it was held that:

"Before evidence can be received against a defendant in a criminal prosecution, of attempts to bribe or intimidate a witness for the state, the defendant must be shown to have authorized such attempts or be connected therewith."

4. See, also: *Brighton* v. *Miles,* 151 Ala. 479 (44 South. 394); *Owens* v. *State,* 74 Ala. 401; *Ashcraft* v. *Commonwealth,* 24 Ky. Law Rep. 488 (68 S. W. 847); *State* v. *Robinson,* 37 La. Ann. 673; *Commonwealth* v. *Robbins,* 3 Pick. (Mass.) 63; *People* v. *Long,* 144 Mich. 585 (108 N. W. 91); *State* v. *Jaeger,* 66 Mo. 173. Under these authorities it was plainly prejudicial to the defendant even if the letter related to the present case, to allow the jury to hear the unauthorized statements of the sister to the effect that the action of Barr in behalf of her brother would place him financially above want.

More important are the alleged errors respecting the instructions given by the court on the subject of self-defense. In the first of the directions to the jury on that subject which have been quoted, the court charged the jury that the danger apprehended by the

defendant and which he resisted, "must be that of a threatened felony." It is believed that the true rule on this subject is that an individual has the right to defend himself against any unlawful force, using only such opposing force as may be reasonably necessary to repel the attack upon himself; that he is entitled to act not only against real, imminent danger of harm to himself at the hands of an assailant, but that also he has a right to resist what reasonably appears to him, acting as a reasonable man under all the circumstances, to be a present threatened danger, although as the event may prove, the danger may not in fact be actual, and finally that the killing of an assailant will not be justifiable unless, judging of the situation from the standpoint of a reasonable man under all the circumstances surrounding the defendant at the time, he has reasonable cause to believe himself to be in imminent danger of death or great bodily harm at the hands of his assailant. In *State* v. *Sloan,* 22 Mont. 293 (56 Pac. 364), the defendant and his wife had separated. Her father, described as being heavier and larger in every way than the defendant, who was a small man, met the defendant and after some conversation in the way of demanding the wife's clothes and the defendant's refusal to give them up, the father-in-law struck the defendant in the face with his fist, breaking the skin of his nose, causing the nose to bleed, got him around the neck with one arm and continued beating him in the face. The struggle went on for a few moments, the decedent maintaining his advantage. Thereupon the defendant drew his revolver, which the deceased caught, but it was discharged, inflicting upon the decedent a fatal wound, from which he died in about three hours. The trial court instructed the jury as follows:

"In order to justify the assault, and to slay an assailant, within the meaning of these instructions, there must be an apparent design on the part of such assailant to either take the life of the person assailed, or the infliction of some great bodily injury, amounting to a felony if carried out; and, in addition thereto, there must be imminent danger of such design being accomplished."

Reversing the case and commenting upon this instruction, the Supreme Court said:

"The right of one assaulted to kill his assailant in self-defense should not be limited by his ability to distinguish between felonies and misdemeanors. He must be guided by a reasonable apprehension of death or great bodily harm. And the fear or apprehension of this latter from an unlawful beating at the hands of the assailant may be sufficient when the assault is lacking in some of the elements of felony": See, also, *Ritchey* v. *People,* 23 Colo. 314 (47 Pac. 272, 384); *McKinney* v. *Commonwealth* (Ky.), 82 S. W. 263; *State* v. *Robinson,* 143 La. 543 (78 South. 933).

In *Rogers* v. *State,* 60 Ark. 76 (29 S. W. 894, 46 Am. St. Rep. 154, 31 L. R. A. 465), there was evidence tending to show that the decedent was the aggressor and, being a large, powerful man, he struck the defendant a violent blow with his fist and was about to throw him down when the first shot was fired. In commenting upon the phrase, "great bodily harm," the trial judge stated that its meaning was "a felony committed on the person." The Supreme Court of Arkansas, speaking by Mr. Justice RIDDICK, said:

"It means a 'great bodily injury' as distinguished from one that is slight or moderate, such as would ordinarily be an assault and battery with the hand or fist without a weapon. To put one in danger of great bodily injury from an assault something more than an attack with the hand or fist would usually be re-

quired, and it would rarely happen that one might lawfully take the life of another to avoid an assault with the fist only. · But cases might be supposed when it would be justifiable to do so; for an assault and battery by a powerful man with his fist upon a weak one might be carried to such an extreme severity as to produce great bodily injury and yet be unaccompanied by such circumstances as to make it a felony. One who intentionally commits a great bodily injury upon the person of another may or may not be guilty of a felony, depending upon the circumstances; but, as such an injury may, under some circumstances, be committed, and still the offender not be guilty of a felony, it is therefore not accurate to define 'great bodily injury' as 'a felony committed on the person.' What constitutes a great bodily injury and whether the circumstances in any case are such as to justify one in believing that such an injury is about to be committed upon him, and in defending himself against it, are matters which must be left, to a great extent, to the judgment of the jury.''

In *State* v. *Keasling,* 74 Iowa, 528 (38 N. W. 397), the jury had been directed respecting self-defense that:

''Under it the right to take life or to resort to the use of a deadly weapon in the resistance of an assault is made to depend upon whether the assault is * * felonious and the danger actual and urgent.''

This was held to be erroneous. In *State* v. *Clark,* 134 N. C. 698 (47 S. E. 36), the trial court had added to the defendant's requested charge the proviso that the assault made upon the defendant was felonious or with felonious intent. The court, holding this to be error, said:

''But the addition to the defendant's prayer for instructions was in itself erroneous. It was not necessary that the assault upon the defendant should have been felonious or committed with a felonious intent.''

*State* v. *Bowling,* 3 Tenn. Cas. 110, is one the facts of which are almost identical with the one at bar. The court said:

"The means by which the great bodily violence is being threatened or inflicted, whether by the use or threatened use of weapons or by the overpowering strength of a stronger man, can make no difference; it is the fact of such violence, real and threatened, that gives the right of self-defense. Where such fact of real violence is found, and the party certainly exposed to it, or honestly believes himself so, then the right to defend against it is an essential element of every free man involved in the proposition that every man is entitled to enjoy life and liberty."

The court in reversing and remanding the case said:

"The fact that the verdict of the jury rebuts the idea of malice, and the proof leads to the same conclusion, leaves the case to stand solely upon the rights of the party to kill to prevent actual violence of the severest character short of death, when inflicted by the blows of a fearful adversary whose strength he was unable to resist in a struggle. We cannot say he was criminal in freeing himself from such violence by the only means in his reach."

In *State* v. *Bartlett,* 170 Mo. 658 (71 S. W. 148, 59 L. R. A. 756), the decedent, who was greatly superior in strength to the defendant, undertook to whip him publicly. After commenting upon the precedents on self-defense, the court, speaking by Mr. Justice SHERWOOD, used this language:

"But nothing above asserted is intended to convey the idea that one man, because he is the physical inferior of another, from whatever cause such inferiority may arise, is, because of such inferiority, bound to submit to a public horse-whipping. We hold it a necessary self-defense to resist, resent and prevent such humiliating indignity,—such a violation of the

94 Or.—29

sacredness of one's person,—and that if nature has not provided the means for such resistance, art may; in short, a weapon may be used to effect the unavoidable necessity.''

In *State* v. *Gray*, 43 Or. 446 (74 Pac. 927), the defendant was going along the county road adjoining the premises of the decedent. The latter hailed him and after a quarrel had ensued jumped over the fence, removed his coat and advanced toward the defendant in a menacing attitude, with threats to take away from the defendant a pistol which he had drawn and beat out his brains with it. In the scuffle which took place the pistol was discharged, inflicting a fatal wound. The decedent was much the superior of the defendant in physical strength, but had no weapon. The court instructed the jury as follows:

''But such right of self-defense as will justify the taking of the life of the assailant can only be exercised to defend his life or defend his person from great bodily harm. But danger of a battery alone will not be sufficient to justify taking the life of his assailant.''

The trial court refused to give the following instruction requested by the defendant:

''It is not necessary that the assault made by the deceased at the time upon the defendant Wilson Gray, if you find that an assault was made, should have been made with a deadly weapon. An assault with the fist alone, if there was an apparent purpose and the ability to inflict death or serious bodily injury by the deceased upon the defendant, Wilson Gray, is sufficient to justify the killing in self-defense, if the defendant Wilson Gray, at the time he shot and killed the deceased, had reason to believe, and did believe, that he was in imminent danger of death or great bodily harm at the hands of the deceased.''

This court, speaking by Mr. Justice WOLVERTON, held that it was error to refuse the requested instruction, and among other things said:

"Retreat or avoidance of further conflict to prevent the taking of human life is only required where the assault is not accompanied with imminent danger to life or great bodily injury, real or apparent. Where, however, the assault is attended with such demonstration, and the present ability to execute it, whether the assailant is armed with a deadly weapon or not, as to indicate to the assailed, acting reasonably upon appearances, that he is in imminent danger of being beaten and maltreated, and probably disfigured or maimed, or his life imperiled, he has a right to withstand the assault, even to the taking of the life of the aggressor.

"No person has a right to advance into a public highway and administer a merciless castigation upon his neighbor who is lawfully there; nor does the law require that a person, when so assailed, shall stop to inquire to what extreme his aggressor will push the attack, but may act at once upon appearances, and resist it with such force as will effectually repel it. A strong, powerful man, with his fists alone is capable of visiting great physical injury upon his victim much his inferior in strength or endurance, and he may even thus take his life. Instances are not wanting where such results have followed. * * And the question as to the degree of danger attending the assault is one for the jury; they putting themselves in the place of the assailed, and acting as reasonable men upon the conditions as they appear to have existed."

The second instruction on self-defense quoted above is an adaptation of language used by Mr. Chief Justice BEAN in *State* v. *Doherty,* 52 Or. 591 (98 Pac. 152). In that case the defendant had treated some men, including the decedent, in a saloon. He requested the latter to treat the crowd, which the decedent did and began to make preparations to go home.

The defendant then demanded that he treat the crowd again and on his refusal began abusing Allen, the decedent, applying various opprobrious epithets to him, when Allen got him by the throat and pushed him into the corner of the room, but did not attempt to strike him. After Allen had left the defendant and walked away at the request of the bartender, the defendant followed him up, still repeating his abuse, despite Allen's request for him not to ask him to buy any more drinks. The defendant thereupon repeated his request, when Allen struck at him, and at that point the defendant drew his pistol, firing five shots at Allen, some of which took effect, killing him in a few minutes. There it was plain, beyond question, that the defendant was the aggressor from the beginning and that no more than a mere assault had been committed up to the moment of the shooting.

With respect to such a case this language of the court was used in commenting upon the Doherty case. That instance is essentially different from the present. The authorities cited in support of the assertion of the opinion that "if the intention of the assailant is only to commit a trespass or simple beating, it would not justify the killing," do not sustain the text. For instance, in *Floyd* v. *State*, 36 Ga. 91 (91 Am. Dec. 760), the Supreme Court of Georgia expressly placed its decision on the ground that—

"It does not appear by the record that there was great superiority in physical strength on the part of the assailant over that possessed by Floyd, nor it appearing that Floyd was in ill health at the time, nor other circumstances existing at the time which produced relatively great inequality between them for sudden combat, we are not able to find any fact in the case which would justify him in repelling the blow with the fist by the use of his knife."

And in the other case cited supporting the doctrine of intention, *State* v. *Benham,* 23 Iowa, 159 (92 Am. Dec. 417), the court does not, as in the Doherty case, hold the defendant responsible for the intention of the assailant without qualification, but says:

"The physical capacity of the two persons would be an important consideration for the jury in determining the question whether the defendant in what he did was within the law of necessary self-defense. So the size and character of the ox-goad or weapon which the deceased seized or had, the manner in which he threatened to use it and the manner in which he entered upon the execution of that threat, would also be important considerations for the jury. Now, none of these circumstances are in any manner alluded to in the charge of the court. The attention of the jury should have been called to these circumstances,—that is to say, to the nature and character of the advance of the deceased upon the defendant. And the jury should have been directed to ascertain whether all the circumstances in evidence denoted or showed an intention on the part of Sheppard to take the life of Benham or to do him some enormous, some dreadful bodily harm; if they did, then Benham in self-defense might lawfully take the life of his assailant, provided he used all the means in his power otherwise to save his own life or prevent the intended harm."

As to the intent of his assailant, the defendant is affected not by what his actual intent was, but, as pointed out in the Benham case, by what the circumstances indicated was the intent. The instruction is erroneous in the same respect as the first one quoted, in stating that the beating, if it endangered life or limb, was felonious. This might or might not have been true, according to the circumstances of the case, and we can easily conceive of cases where great bodily harm could be inflicted without laying the assailant

liable to a charge of felony. The question of whether there was a real or apparent danger to the defendant of death or great bodily harm, is one of fact for the jury. The defendant is not bound at his peril to divine the intent of his assailant and determine at his peril whether he has a felonious purpose or whether the assault committed would turn out to be a felonious one. He is entitled to protect himself against death or great bodily harm, whether that great bodily harm be felonious or otherwise. When the court assumes to apportion the amount of real or threatened danger, it invades the province of the jury. It is not intended to say that a defendant may in all cases resort to homicide to protect himself against injury, for it is well settled and reasonable that defense is not to be used as an instrument of vengeance and must not be disproportionate to the real or threatened danger. But whether the threatened or inflicted injury is felonious or not, whether it be inflicted by the use of weapons or by the hands or feet of one superior in strength, if it amounts to great bodily harm in the estimation of the jury, the latter would have a right to justify the application of sufficient force by the defendant to repel the danger, and if in reason it is apparently necessary to go to the extreme of homicide, the defendant is entitled to be acquitted.

In *Hill* v. *State,* 94 Miss. 391 (49 South. 145), the court had instructed the jury that:

"The words 'great bodily harm,' in contemplation of law do not mean such bodily harm as might have been inflicted by mere blows with the hands or feet."

The defendant had requested instructions to the effect that if deceased was physically capable of inflicting great bodily harm upon the defendant with his

hands or feet, and the defendant had reason to believe, and did believe, that the decedent was about to inflict such an injury upon him, and under such belief fired the fatal shot to protect himself from such harm, then it is immaterial whether the deceased was armed or not at the time of the killing. But the requested instruction was refused. After laying down the rule in substance that where two combatants are equally matched and the attack does not furnish the defendant with reasonable grounds to apprehend danger to his life, or the inflicting of great bodily harm, the opinion goes on to say:

"But the trouble with this instruction * * for the jury is that it tells the jury, without qualification or modification of any kind, that the great bodily harm which the law contemplates never can be, under any circumstances, such as may be inflicted by mere blows with the hands or feet. This is palpably erroneous. There may be many cases in which the disparity between the combatants is so overwhelming that the one of superior physical power may inflict great bodily harm, or death itself, by mere blows with the hands or feet."

In the present case there is evidence to the effect that the decedent had knocked down the defendant and had beaten him so that Hale was compelled to lift him to his feet; that without resistance he was being taken out of the house by Hale and that under these conditions, without any hostile demonstration on the part of the defendant, McCue again attacked him, when the fatal shots were fired. Although many expressions have been used to the effect that a man rightfully may defend himself against a felonious attack, yet it is not reasonable or just to say that the attack must in all cases be a felonious one before the defendant is allowed to repel it with sufficient force

to prevent not only danger to his life but also great bodily harm, irrespective of whether the latter is effected by felonious means or not. Assault and battery is not a felony in this state: Laws 1911, Chap. 133. Yet all must agree that a strong, muscular man may inflict great bodily harm upon a weak or crippled one without being guilty of more than the misdemeanor defined in that statute. A felony is composed of two elements: the unlawful act, and the felonious intent. It is not the intent of the assailant which harms the one he attacks, neither is the latter bound by it nor required to ascertain it. He may repel the force employed against him, irrespective of the intent of his adversary, whether the latter discloses it or not. It is the imminent danger, real or apparent, of great bodily harm to himself which justifies a defendant in protecting himself. The intent of the other party may be felonious or not, but it is not controlling. The weak man's body, shattered though it may be by accident or disease, is his own and the law does not require him to submit to a severe beating likely to maim him or permanently injure him, at the hands of a powerful and greatly superior antagonist, all because the weak man cannot hold his own and the threatened injury will not be felonious but only a misdemeanor.

5. The language of the court about indirect evidence does not comply with our own statute on the subject as laid down in Section 796, L. O. L., in that the instruction says the inference *may* (not *must*) be founded upon a fact legally proved, and further going on in the alternative says that the inference *may* be founded upon such a deduction from that fact as is warranted by a consideration of the usual propensities and passions of man, etc., whereas the Code requires

the inference to be founded not only upon a fact
legally proved, but also, and not in the alternative,
upon the deduction mentioned.

6. The court gave no instructions to the jury what-
ever respecting the uncommunicated threats deline-
ated in the testimony, besides refusing those requested
by the defendant, as above quoted. In *State* v. *Tar-
ter,* 26 Or. 38 (37 Pac. 53), Mr. Chief Justice LORD
wrote:

"Where the circumstances raise a question of self-
defense, evidence of uncommunicated threats recently
made is admissible for the purpose of showing the
motive of the deceased, and the nature and character
of the assault. So, also, proof of threats not com-
municated is often admitted for the purpose of cor-
roborating evidence of those communicated; and, like-
wise, where it is doubtful from the evidence which
party commenced the affray, communicated threats
are admissible to show who was probably the first as-
sailant."

*State* v. *Quen,* 48 Or. 347 (86 Pac. 791), was a case
relating to threats, and Mr. Justice MOORE declared
that:

"Evidence of such threats, when recently made, or
when so connected as to form a chain of menaces,
evincing a present purpose, is admissible in doubtful
cases to illustrate what may be deemed the reason-
able actions of participants in an encounter, for the
purpose of showing the *quo animo* of the person mak-
ing the threats and thereby increasing the probabil-
ities that he was the aggressor at the time of the con-
flict." (Citing authorities.)

See, also, *State* v. *Doris,* 51 Or. 136 (94 Pac. 44, 16
L. R. A. (N. S.) 660), and *State* v. *Parker,* 60 Or.
219 (108 Pac. 1011).

Although one of the requests is subject to verbal
criticism respecting the words "tending to show," yet

the defendant was entitled to instructions respecting the purpose for which the evidence of threats was admitted. It would be extremely technical utterly to omit all reference to a phase of the case so important as this because of so slight a variance from exact legal statement.

7. Under the authority of *State* v. *Gray*, 43 Or. 446 (74 Pac. 927), the last of the requested instructions above quoted respecting the doctrine of retreat when a man is where he has a right to be, should have been given. Some of the requests to charge, not here quoted, leave out of view the element that the extreme of killing must be apparently necessary as a defense.

8. It is essential that the defense must not be excessive or disproportionate to the force involved in the attack upon the defendant, all to be judged by the jury from the standpoint of a reasonable man in the situation of the defendant at the time, under all the circumstances surrounding him.

The trial of the case was characterized and the record burdened by investigation of several collateral matters unnecessary to a proper consideration of the case. It is believed that on a retrial the proceedings will be controlled within reasonable limits, for it is said in Section 725, L. O. L., that collateral questions shall be avoided.

On account of the errors mentioned the defendant is entitled to a new trial, and it is so ordered.

REVERSED AND REMANDED.

JOHNS, J., concurs in the result of this opinion.

HARRIS, J.—Although I cannot concur in all the views expressed by Mr. Justice BURNETT, yet I do concur in his conclusions that prejudicial errors affecting substantial rights of the accused occurred

during the trial, and that the judgment, from which the defendant appealed, must be reversed and a new trial granted. A statement of the facts may be found in the opinion written by Mr. Justice BURNETT.

9. The testimony of W. S. Caverhill about the defendant's saying that "no deputy sheriff would take him, he wouldn't allow any John Carter to be fooling around him"; and that, "he wasn't afraid of the law," is, in the circumstances shown by this record, manifestly incompetent. There are many cases where statements made subsequent to a homicide are received in evidence as part of the *res gestae;* and there is a class of cases where hostile declarations made after the killing are admissible for the . purpose of showing the state of the accused's mind toward the decedent: *State* v. *Brown,* 28 Or. 147, 158 (41 Pac. 1042) ; 21 Cyc. 898. The defendant requested Norman Caverhill to notify the sheriff of what had occurred and if the officer wished, the defendant would go to Canyon City, the county seat, or if the sheriff, "thought necessary he could come over after the defendant." The sheriff came to Long Creek, which is but a short distance from the scene of the homicide, and the defendant surrendered himself to the sheriff at that place. At no time did the defendant defy arrest. Immediately after the shooting Rader went to the home of Earl Caverhill, told of what had occurred and suggested that "one fellow better go for a doctor." The defendant returned to the house where McCue was, and, according to the evidence, took some part in caring for McCue until the time of his death. The allusion to the deputy sheriff was prompted by the circumstance that Joe Wilmoth and John Carter "were deputies over there." Defendant "didn't want to come with them" because of some bad feeling be-

tween him and them. If the defendant had defied anyone to arrest him, or if he had resisted arrest, quite a different situation would have been presented. The accused never at any time said or indicated that he could not be or would not be arrested; but, upon the contrary, he took active steps to notify the sheriff and expressed a willingness to go to the sheriff or await his arrival. On the record presented here the testimony of W. S. Caverhill was not competent, and its only possible effect was to create a pronounced prejudice against the defendant.

10. The letter written by Jean Meyer was not made to appear competent. It was proper to show upon cross-examination that this witness was interested in the outcome of the trial; and if the letter related to the case now under consideration, it was competent for the plaintiff to show that fact, not as evidence against the defendant, but for the purpose of disclosing the extent of the interest manifested by the witness: *State* v. *Mc-Cann*, 43 Or. 158 (72 Pac. 137); *State* v. *Lem Woon*, 57 Or. 482, 489 (107 Pac. 974, 112 Pac. 427). There is not a syllable of evidence indicating that the letter related to the case then on trial; but, upon the contrary, every word of affirmative testimony is to the effect that the letter did not relate to "this case." The following questions were asked and answers given by the witness:

"Q. Did you write any letters in connection with it?

"A. None whatever.

"Q. Positive of that as any statement you have made in this case, now?

"A. Well, I don't know of any letters I have ever written to anyone.

"Q. Didn't you offer in writing to see that a man was properly financed if he would come here as a witness?

"A. Not to that effect, no, sir.

"Q. Nothing to that effect?

"A. No, sir, not in this case."

The trial began on May 29, 1918, and the letter was dated May 18, 1918. It is entirely clear from the record that the witness was aware of the fact that the cross-examiner was in possession of the letter even though we assume that she had not yet seen it in his hands; and it is likewise clear that she had not forgotten the contents of the letter which she had written only a few days previously; and, hence, so far as her testimony is concerned, it is unequivocally and affirmatively to the effect that the letter did not relate to "this case." Aside from the testimony of Jean Meyer there is no evidence whatever upon the subject except inferences to be drawn from the letter itself. E. Barr, the person to whom the letter was addressed, for aught that appears in the record, was neither called nor subpoenaed as a witness by either party; nor does it appear that he had knowledge of any fact which would have been competent as evidence in the case. Moreover there is no evidence to show that Jean Meyer thought or feared that E. Barr would or might be a witness in "this case." One might speculate about the purpose of the letter, but the result would be a mere guess. If the letter did in truth relate to "this case," the prosecution might be entitled to it as evidence affecting the interest of the witness and for that purpose only; and even then fairness to the accused would suggest that the court explain to the jury the purpose of the evidence and the limitations which must be placed upon it. If, on the other hand, the letter did not in truth relate to "this case," the prejudicial effect of the letter is so manifest that argument about it becomes wasteful excess. Before the prosecution can rightfully submit the letter to the jury there must be

some evidence showing that the writing relates to "this case." The record presented to us is wanting in this respect.

The testimony of the lawyer concerning the advice given by him to the decedent was incompetent.

11. In the opinion of the writer the testimony of Charles Lunceford was competent. The conversation between this witness and the defendant occurred while the latter was on his way to the Johnson place. The defendant offered to sell the grass on that place for a specified sum. There was evidence from which the jury could infer that the defendant knew that McCue was at that very moment in possession of the Johnson place. The conversation with Lunceford characterized the mental attitude of the defendant. It was competent for the jury to consider all that was said by the defendant in this conversation for the purpose of determining the mental attitude of the defendant towards McCue. No living person, except the defendant, saw what occurred in the cabin during the interim between Hale's first departure from the cabin and his return when he found the defendant "churning" the defendant's head upon the floor. It was for the jury to decide who was the aggressor, and in order that the jurors might properly decide that question, it was proper for them to consider the mental attitude of the defendant.

12. Instruction No. 19 was as follows:

"By 'great bodily harm' is meant more than a mere injury by the fist such as is likely to occur in an ordinary assault and battery. The injury apprehended must be more severe and serious than that usually inflicted in an ordinary fight with the fists, without weapons. Fear of a slight injury is not sufficient. Nor will a mere assault, not felonious, furnish an excuse for the taking of life. If the intention of the assailant is only to commit a trespass or simple beat-

ing, it will not justify his killing. But you may consider the relative size and strength of the parties and the ferocity of the attack in determining whether the intended beating, if any, was of such a character as to endanger life or limb, and if so, it will then be felonious and the assaulted person is justified in taking the life of his assailant, if necessary, to preserve his own person or to protect him from such felonious beating."

It will be observed that the court told the jury that "if the *intention* of the assailant is only to commit a trespass or simple beating, it will not justify his killing"; and then the court informed the jurors that they could consider the relative size and strength of the parties and the ferocity of the attack in determining whether "the *intended* beating" was of such a character as to injure life or limb. The right of self-defense is not controlled by the intention of the assailant, for the assailed may act upon appearances. This rule is hornbook law in this jurisdiction. Obviously, the instruction was error, for by that instruction the jury was told:

"If the intention of the assailant is only to commit a trespass or simple beating, it will not justify the killing."

There were other instructions, it is true, which correctly told the jury that the defendant had a right to act upon appearances.

We have then for consideration a charge containing correct and also incorrect instructions. The charge to the jury must of course be read as a whole; but when the instructions are so read, the correct instructions cannot be said to have cured the incorrect instructions. In the very nature of things instruction No. 19 is one of the instructions which the jury undoubtedly understood and remembered. All the direct evidence is to

the effect that the decedent used his hands only in making any assault that he may have made upon the defendant; and, hence, when the court gave instruction No. 19 we must reasonably assume that every juror instantly made a mental application of the instruction to the concrete facts of the alleged assault. The very circumstances of the assault which the defendant claimed was made upon him by the decedent served to emphasize and give prominence and individuality to instruction No. 19. On the other hand, correct instructions relating to self-defense were couched in general and comprehensive language; and, as it seems to the writer from an examination of the record, there was nothing to give to any of these correct instructions the same degree of emphasis as was given to instruction No. 19 by the peculiar circumstances of the alleged assault. If the jury followed instruction No. 19, a substantial right of the defendant was prejudiced. If the jury obeyed the correct instructions, the accused was not injured. It is not known, nor can it be ascertained, whether the verdict was based upon the erroneous or upon the correct portions of the charge. The instructions are in direct conflict and are so disconnected in context "that they cannot be read together as a harmonious and correct statement of the principle of law involved": *State* v. *Miller,* 43 Or. 325, 333 (74 Pac. 658, 660).

The defendant vigorously contends that the right of self-defense is not limited to the prevention of a felony actually or apparently about to be committed upon the slayer. This question raised by the defendant cannot here be said to be merely academic as it was in *State* v. *Butler,* (Or.), 186 Pac. 55, for here the instructions to the jury and the recorded evidence necessarily require a solution of the problem. In instruc-

tion No. 15 the court told the jury that the statute of this state provides that "the killing of a human being is justifiable when committed by any person to prevent the commission of a felony upon him." Again, after instructing the jury that "before a person is justified under this law of self-defense in taking the life of another, it must appear" that the danger is actually or apparently imminent and must be such that the assailed believes, and has good reason to believe, "that he is in danger of losing his life or of great bodily harm; the danger must be that of a threatened felony."

13. Throughout the discussion we must bear in mind that there are no indictable common-law offenses in this state. We must look to our statutes for the crimes themselves, although when necessary we may look to the common law for definitions of crimes: *State* v. *Gaunt,* 13 Or. 115, 120 (9 Pac. 55); *State* v. *Ausplund,* 86 Or. 121, 131 (167 Pac. 1019).

The Code defines murder in the first degree, murder in the second degree and manslaughter. The term "manslaughter" includes five specified classes of cases of homicide; as, a voluntary killing without malice and without deliberation, upon a sudden heat of passion caused by a provocation apparently sufficient to make the passion irresistible; an involuntary killing in the commission of an unlawful act or a lawful act without due caution or circumspection; assisting another to commit self-murder or purposely and deliberately procuring another to commit suicide; death caused by an unlawful abortion; and an involuntary killing of a patient by an intoxicated physician. The next section of the Code, Section 1902, L. O. L., declares that:

"Every other killing of a human being by the act, procurement, or culpable negligence of another, when such killing is not murder in the first or second degree,

94 Or.—30

or is not justifiable or excusable as provided in this chapter, shall be deemed manslaughter.''

If, therefore, a killing ''is not justifiable or excusable as provided in this chapter,'' the inescapable result is that the killing must be culpable, because, if not murder in the first or second degree and even though not coming within any one of the five specified classes of manslaughter, a homicide is inevitably manslaughter by force of the words ''every other killing * * by the act * * of another,'' in Section 1902, L. O. L.

We are nowise concerned in the common-law distinctions between justifiable and excusable homicide, for the present inquiry is not dependent upon any of those differences. Sections 1908, 1909 and 1910, L. O. L., are the sections ''in this chapter'' which enumerate the cases of justifiable and excusable homicide. Section 1908 may be eliminated, since it applies only to a killing when committed by public officers or those acting in their aid and assistance and by their command in either of four specified classes of cases. Section 1910 may also be excluded from the discussion, for it excuses certain cases of homicide resulting from accident or misfortune. Section 1909, the remaining section, is the only one which is relevant to the present investigation and for that reason it is here transcribed in full:

''The killing of a human being is also justifiable when committed by any person as follows:

''1. To prevent the commission of a felony upon such person or upon his or her husband, wife, parent, child, master, mistress, or servant;

''2. To prevent the commission of a felony upon the property of such person, or upon property in his possession, or upon or in any dwelling house where such person may be;

''3. In the attempt, by lawful ways and means, to arrest a person who has committed a felony or in the

lawful attempt to suppress a riot or preserve the peace."

8. The only portions of Section 1909 which can anywise be material to our inquiry are subdivision 1 and the words "or upon or in any dwelling-house where such person may be." But whether the third or both these portions are applicable, the result is the same, because each declares that a homicide is justifiable when committed to prevent the commission of a felony; and this is one way of saying that homicide when done to prevent the commission of a misdemeanor is at least manslaughter, because if the killing does not fall within one of the sections defining murder or within any one of the five sections specifically defining manslaughter, it is irresistibly drawn within the embrace of Section 1902, L. O. L.; and, therefore, unless Section 1909 is invalid, it is correct to instruct a jury that the danger whether actual or reasonably apprehended, "must be that of a threatened felony."

The Code divides crimes into felonies and misdemeanors: Section 1370, L. O. L. There is no middle ground; no third class of crimes. Every criminal act of violence is either a felony or misdemeanor. Any act, if made criminal at all by our Code, is necessarily a felony or a misdemeanor. All crimes which are punishable with death or by imprisonment in the penitentiary are felonies, while "every other crime is a misdemeanor": Sections 1371 and 1372, L. O. L. When the legislature used the word "felony" in Section 1909, L. O. L., it necessarily meant the offense defined in Section 1371, L. O. L., for that section contains the only definition of the term found in the Code: *Ex parte Biggs,* 52 Or. 433, 435 (97 Pac. 713).

If alternative penalties for a crime are provided for, so that the offender may either be committed to the

penitentiary, or, in the discretion of the trial judge, be sentenced to pay a fine or serve time in the county jail, the offense is nevertheless deemed to be a felony until and unless the penalty actually imposed is other than imprisonment in the penitentiary; but if the penalty actually imposed is other than imprisonment in the penitentiary, the crime is deemed a misdemeanor after the judgment prescribing the penalty: Section 1371, L. O. L.; *Turner* v. *State,* 40 Ala. 21, 29; *State* v. *Waller,* 43 Ark. 381, 388; *People* v. *War,* 20 Cal. 117, 119; *Miller* v. *State,* 58 Ga. 200, 203; *In re Stevens,* 52 Kan. 56, 60 (34 Pac. 459); *State ex rel.* v. *Foster,* 187 Mo. 590, 603 (86 S. W. 245); *People* v. *Hughes,* 137 N. Y. 29, 34 (32 N. E. 1105); *People* v. *Van Steeansburgh,* 1 Parker Cr. (N. Y.) 39, 45; *McKelvy* v. *State,* 87 Ohio St. 1, 7 (99 N. E. 1076); *Quillian* v. *Commonwealth,* 105 Va. 874, 882 (54 S. E. 333, 8 Ann. Cas. 818); *State* v. *Harr,* 38 W. Va. 58, 65 (17 S. E. 794). When, therefore, life is taken to prevent an offense which, if committed, *may* be punished by imprisonment in the penitentiary, the slayer prevents the commission of a "felony" within the meaning of Section 1909, even though for such offense there is a lesser alternative penalty.

The defendant argues that the right of self-defense is not limited to the prevention of a felony, but that it extends to all cases where it is necessary to prevent death or great bodily harm. This is another way of saying that a person may slay to prevent the commission of an act which would, if consummated, produce great bodily harm, regardless of whether such consummated act is or is not a felony.

Although the words "great bodily harm" do not constitute the only language of the books, yet their frequent appearance has placed them among the familiar

words of text-writers and jurists. The reported opinions of this court show that the words "great bodily harm" have been a part of the vocabulary of nearly every, if not every, member of this tribunal who has written upon the subject of self-defense: *Goodall* v. *State,* 1 Or. 334, 337 (80 Am. Dec. 396); *State* v. *Dodson,* 4 Or. 65, 70; *State* v. *Morey,* 25 Or. 241, 250 (35 Pac. 655, 36 Pac. 573); *State* v. *Tarter,* 26 Or. 38, 42 (37 Pac. 53); *State* v. *Henderson,* 24 Or. 100, 105 (32 Pac. 1030); *State* v. *Porter,* 32 Or. 135, 154 (49 Pac. 964); *State* v. *Bartmess,* 33 Or. 110, 125 (54 Pac. 167); *State* v. *Smith,* 43 Or. 109, 117 (71 Pac. 973); *State* v. *Gibson,* 43 Or. 184, 192 (73 Pac. 333); *State* v. *Miller,* 43 Or. 325, 332 (74 Pac. 658); *State* v. *Gray,* 43 Or. 446, 454 (74 Pac. 927); *State* v. *Thompson,* 49 Or. 46, 49 (88 Pac. 583, 124 Am. St. Rep. 1015); *State* v. *Remington,* 50 Or. 99, 110 (91 Pac. 473); *State* v. *Doris,* 51 Or. 136, 157, 165 (94 Pac. 44, 16 L. R. A. (N. S.) 660); *State* v. *Doherty,* 52 Or. 591, 594 (98 Pac. 152); *State* v. *Finch,* 54 Or. 482, 495 (103 Pac. 505); *State* v. *Goodager,* 56 Or. 198, 201 (106 Pac. 638, 108 Pac. 185); *State* v. *Ryan,* 56 Or. 524, 536 (108 Pac. 1009); *State* v. *Meyers,* 57 Or. 50, 56 (110 Pac. 407, 33 L. R. A. (N. S.) 143).

The word "felony" is likewise a part of the language of the books, for since the time slaying in self-defense was recognized by the common law as a right, every writer and jurist who has discussed the subject in the light of the common law has inseparably connected the term "felony" with the right of self-defense.

Nearly two centuries ago Sir Michael Foster wrote as follows:

"In the case of justifiable self-defense the injured party may repel force by force in defense of his person, habitation, or property, against one who manifestly intendeth and endeavoreth by violence or surprise to

commit a known felony upon either'': Foster's Crown Cases, 273.

The words ''known felony'' are designedly used for the purpose of excluding secret felonies. Again, the same writer, when speaking of a killing in a mutual conflict, said:

''He therefore who, in the case of a mutual conflict, would excuse himself upon the foot of self-defense must show, that before a mortal stroke given he had declined any further combat and retreated as far as he could with safety; and also that he killed his adversary through mere necessity, and to avoid *immediate death.* If he faileth in either of these circumstances he will incur the penalties of manslaughter'': Foster's Crown Cases, 277.

See, also, 1 Hawk. P. C. 82; 1 Hale's P. C. 482–488; Wharton on Homicide (3 ed.), 361; 2 Cooley's Blackstone (3 ed.), 282 (Book IV, 180).

In his discourse on homicide Sir Michael Foster also wrote as follows:

''The right of self-defense in these cases is founded in the law of nature, and is not, nor can be, superseded by any law of society; for before civil societies were formed, (one may conceive of such a state of things though it is difficult to fix the period when civil societies were formed,) I say before societies were formed for mutual defense and preservation, the right of self-defense resided in individuals; it could not reside elsewhere; and since in cases of necessity, individuals incorporated into society cannot resort for protection to the law of the society, that law with great propriety and strict justice considereth them, as still, in that instance, under the protection of the law of nature'': Foster's Crown Cases, 273.

The same thought is expressed by Blackstone as follows:

"Self-defense, therefore, as it is justly called the primary law of nature, so it is not, neither can it be in fact, taken away by the law of society": 2 Cooley's Blackstone, 3 (Book III, 4).

This doctrine has been repeated with such frequency that it has come to be almost an axiom of the law: *Isaacs* v. *State,* 25 Tex. 174, 177; *Long* v. *State,* 52 Miss. 23, 28; *Gray* v. *Combs,* 7 J. J. Marsh. (Ky.) 478 (23 Am. Dec. 431, 436); Wharton on Homicide (3 ed.), 354; *United States* v. *Cuterbridge,* 5 Sawy. 620, 623 (Fed. Cas. No. 15,978); 1 Michie on Homicide, 322; *Young* v. *State,* 53 Tex. Cr. App. 416 (110 S. W. 445, 447, 126 Am. St. Rep. 792); *Lander* v. *State,* 12 Tex. 462, 476; *Parrish* v. *Commonwealth,* 81 Va. 1, 12; *State* v. *Tarter,* 26 Or. 38, 43 (37 Pac. 53); *State* v. *Ryan,* 56 Or. 524, 536 (108 Pac. 1009).

While it is true that it has been said that "society may curtail this right" of self-defense "and no doubt does restrain its exercise in many important particulars": *Gray* v. *Combs,* 7 J. J. Marsh. (Ky.) 478 (23 Am. Dec. 431, 437); 13 R. C. L. 810; yet at this stage of the discussion we are not so much interested in determining whether society can curtail the right of self-defense, or in the extent to which curtailment can be carried, as we are concerned in ascertaining the exact meaning and extent of the right of self-defense when viewed in the abstract.

This right of self-defense, now often designated by writers and jurists as a natural right which has not been and cannot be superseded by society, passed through a slow process of development before it was finally established. There was a time, indeed, when homicide in self-defense was itself a capital offense. Originally, slaying in self-defense operated as a forfeiture of the property of the slayer, and, in order to

avoid the physical penalty of his act, he applied to the king for a pardon. The chancellor signed the pardon in the king's name, but in order to avoid this useless formality "the chancellor as the dispenser of equity soon surpassed the chancellor as the mere keeper of the great seal." Finally, subsequent to the enactment of the Statute 24 Henry VIII, c. 5, "partly as the result of a statute [the statute last mentioned] and partly by the liberality of the courts of common law," the equitable defense, so designated because of the authority exercised by the chancellor as the dispenser of equity, became a legal defense. The history of the law of self-defense to the middle of the eighteenth century was as follows:

"Self-defense merely was no excuse, but ground for pardon; but it was an excuse in equity, and the equitable defense was at last accepted at law": 16 Harvard Law Review, 567, 572.

See, also, 21 Cyc. 794; 3 Columbia Law Review, 526; 2 Pollock and Maitland on History of English Law, 479.

The law upon the subject of forfeiture remained in practice for a long time; and while the law finally fell "into desuetude in the course of the eighteenth century," yet it was not until 1828 that forfeitures were formally abolished in England by 9 Geo. IV, c. 31, Section 10, which provides that no punishment or forfeiture shall be incurred by any person who shall kill another in his own defense: 3 Stephen on History of the Criminal Law of England, 77; 2 Pollock and Maitland on History of English Law, 481. Thus it appears that slaying in self-defense, now designated by modern authorities as an inalienable right, was originally an offense, and on that account was followed by a forfeiture of the slayer's property; and, moreover, it was necessary for the slayer to apply for a pardon in order

to avoid an additional penalty, which without a pardon could be imposed upon his person.   In an early period pardons were not issued "as of course," although at a later date they "became pardons of course"; and at a still later time, instead of a pardon being issued by the king or by the chancellor, the jury was empowered to acquit the slayer.   The practice of forfeiture seems to have endured longer than the practice of issuing pardons.   There is, therefore, in view of the history of the right of self-defense, substantial foundation for the statement in 16 Harvard Law Review, 567, that

"The right to kill in self-defense was slowly established and is a doctrine of modern rather than of medieval law."

Although expressions may be found in some of the earlier writings which go no further than to say that the assailed may slay to prevent immediate death, yet all will admit that the right of self-defense is not confined within such narrow limits.   It is conceded by all that an ordinary assault with the fists or the danger of a mere battery alone without any danger or apparent danger of more serious harm  will not justify the taking of human life: *State* v. *Gray,* 43 Or. 446, 454 (74 Pac. 927); 1 Bishop's New Criminal Law, 508; 21 Cyc. 801, 813.   However, it is likewise conceded by all that a strong and powerful man with his fists alone is capable of visiting great physical injury upon a weak and frail man; and hence when the assault is attended with such demonstration and the present ability to execute it, whether the assailant is armed or not, as to indicate to the assailed, acting reasonably upon appearances, that he is in imminent danger of being beaten and disfigured, or maimed, or his life imperiled, he has a right to withstand the assault, even to the extent of taking the life of the assailant": *State* v. *Gray,*

43 Or. 446, 455 (74 Pac. 927); *State* v. *Benham*, 23
Iowa, 154 (92 Am. Dec. 417); 13 R. C. L. 820. Here,
then, is at least one limitation upon a right which, after
a slow process of development, was incorporated into
the common law and was a part of it when we received
and accepted that great body of law. Does the com-
mon law prescribe any other limitations? If it does,
what are those limitations?

One may not lawfully kill in self-defense to prevent
a simple assault or ordinary battery with the fists, but
one may slay to avert a more serious harm. How
much more serious must that harm be? When com-
mon-law writers speak of "great bodily harm," what
do they mean? Are the words "great bodily harm"
used to mean the same thing as "felony" or do they
signify something less than or different from a felony?
The books abound with a variety of expressions when
speaking of the circumstances which will or will not
justify slaying in self-defense; as, "death or great
bodily harm" (21 Cyc. 791, 800, 802, 812, 813–817, 819;
13 R. C. L. 811, 813, 814, 820); "if the assault is not
felonious" the slayer is not justified (21 Cyc. 791);
"death, great bodily harm, or some felony" (21 Cyc.
800); "must be of a felonious nature; it must be of
such a nature as to apparently indicate that if carried
out it will result in death or great bodily harm" (21
Cyc. 801); killing is not justifiable "unless it is accom-
panied by acts indicating imminent danger of great
bodily harm or felony * * or if it is some other act
less than a felony" (21 Cyc. 802); "may kill to save
life, or limb, or to prevent a great crime" (13 R. C. L.
814); "loss of life or of suffering serious bodily
harm" (13 R. C. L. 816); "must be one of great injury
to the person, that would maim or be permanent in its
character, or which might produce death" (Wharton

on Homicide, 376); "the danger must involve peril to
life or limb, though the injury feared need not neces-
sarily be a forcible felony, or felonious assault."
(Wharton on Homicide, 376, citing *Rogers* v. *State,* 60
Ark. 76 (29 S. W. 894, 46 Am. St. Rep. 154, 31 L. R. A.
465); *Evans* v. *State,* 120 Ala. 269 (25 South. 175);
*Ritchey* v. *People,* 23 Colo. 314 (47 Pac. 272, 384).

The holdings in *Rogers* v. *State* and *Ritchey* v. *Peo-
ple* were based upon statutes; and so, too, many of the
modern precedents are likewise based upon statutes.
In twenty-four of the states there has been legislation
defining the right of self-defense. In some of the
states, as, in Arizona, California, Idaho, Montana and
Utah, there are statutes providing that a homicide is
justifiable when resisting any attempt to murder any
person "or to commit a felony, or to do some great
bodily injury upon any person"; or, when committed
in the lawful defense of such person or certain other
named persons, "when there is reasonable ground to
apprehend a design to commit a felony, or to do some
great bodily injury": Rev. Stats. Ariz. (1913 Penal
Code), § 180; Cal. Penal Code (Deering 1915), § 197;
2 Idaho Rev. Codes, § 6570; 2 Rev. Codes of Mont.
(1907), § 8301; Comp. Laws of Utah (1917), § 8032.
In Arkansas the legislature has said that homicide is
justifiable when committed in necessary self-defense
"against one who manifestly intends or endeavors, by
violence or surprise, to commit a known felony"; and,
further, "in ordinary cases * * it must appear that
the danger was so urgent and pressing that in order to
save his own life, or to prevent his receiving great bod-
ily injury, the killing of the other was necessary":
Digest of the Statutes of Arkansas, § 1911. The states
of Colorado and Illinois have statutory provisions like
that of Arkansas: 1 Mills Ann. Stats. (1912), §§ 1761

and 1763; 2 Ill. Stats. Ann. (1913), §§ 3763, 3764. In Florida a homicide is justifiable when committed in the lawful defense of such person or of certain named persons "when there shall be reasonable ground to apprehend a design to commit a felony or to do some great personal injury": 2 Fla. Comp. Stats. (1914), § 3203. The states of Minnesota, New York and Washington have statutes like that of Florida: Gen. Stats. Minn. (1913), § 8623; Gilbert's Cr. Code (1919), § 1055; Remington & Ballinger's Ann. Code & Stats. of Washington (1909), § 2406. In Kansas the statute reads as follows:

Homicide shall be deemed justifiable when committed "in resisting any attempt to murder such person, or to commit any felony upon him or her, or in any dwelling-house in which such person shall be; or, second, when committed in the lawful defense of such person * * when there shall be a reasonable cause to apprehend a design to commit a felony, or to do some great personal injury * * ": Gen. Stats. Kan. (1915), § 3370.

Mississippi, Missouri, New Mexico, North Dakota, Oklahoma, South Dakota and Wisconsin have statutes like the legislation in Kansas: 1 Hemingway's Ann. Miss. Code, § 960; 2 Rev. Stats. Mo. (1909), § 4451; New Mexico Stats. (1915), § 1471; 2 Comp. Laws N. D. (1913), § 9503; 1 Rev. Laws Okl. (1910), § 2334; Comp. Laws S. D. (1913), § 268; Wis. Stats. (1917), § 4366. In Vermont a killing is guiltless when a person kills another "in the just and necessary defense of his own life" or the life of certain designated persons, or kills "another who is attempting to commit murder, rape, burglary or robbery, with force or violence": Pub. Stats. Vt. (1906), § 5698. The legislation in Georgia will be referred to hereinafter. Thus it is seen that in each of the states of Arkansas, Colorado and Illinois

there is a statute which affirmatively declares that slaying is justifiable to prevent "great bodily harm"; and, therefore, in view of this affirmative legislation the holdings in *Rogers* v. *State,* 60 Ark. 76 (29 S. W. 894, 46 Am. St. Rep. 154, 31 L. R. A. 465), and *Ritchey* v. *People,* 23 Colo. 314 (47 Pac. 272, 384), lose much of their force when attempted to be applied in jurisdictions like Oregon, when there is no analogous legislation.    It will also be observed that in all the remaining states to which attention has been directed, except the state of Vermont, the language of the statutes is in the alternative, for the words are: "Felony, *or* * * some great bodily injury"; and, hence, precedents based upon statutes in any of those jurisdictions necessarily proceed upon the theory that "great bodily harm" is not always the equivalent of "felony," and consequently cases like *State* v. *Sloan,* 22 Mont. 293 (56 Pac. 364), cannot aid us when dealing with our statute, which is wholly different from the Montana enactment. *Territory* v. *Baker,* 4 N. M. (Johns.) 117 (13 Pac. 30, 40), is sometimes referred to as authority for saying that "great bodily harm" must amount to a felony before life may be taken in self-defense.    When that case was decided there was a statute declaring that homicide was justifiable when committed in the lawful defense of such person "when there shall be reasonable ground to apprehend a design to commit a felony, *or* to do some great personal injury * * "; and in view of that language it is difficult to agree with the conclusion that "great bodily harm" must amount to a "felony." The holding in *State* v. *Sloan,* 22 Mont. 293 (56 Pac. 364), is sounder, more logical and more consistent with the plain words of positive legislation.

We may now give our attention to precedents which were unaffected by and were decided upon rules of the

common law. In *Pond* v. *People,* 8 Mich. 150, Mr. Justice CAMPBELL, one of America's really great judges, said:

"The danger to be resisted must be to life, or of serious bodily harm of a permanent character."

And, again:

"The rule extends only to cases of felony; and in those it is lawful to resist force by force. If any forcible attempt is made, with a felonious intent against person or property, the person resisting is not obliged to retreat, but may pursue his adversary, if necessary, till he finds himself out of danger."

In *United States* v. *Wiltberger,* 3 Wash. C. C. 515 (Fed. Cas. No. 16,738), Mr. Justice WASHINGTON said:

"The law is, that man may oppose force to force, in defense of his person, * * against one who manifestly endeavors, by surprise or violence, to commit a felony, as murder, robbery, or the like. * * The intent must be to commit a felony. If it be only to commit a trespass, as to beat the party, it will not justify the killing of the aggressor. * * The intent to commit a felony must be apparent; which will be sufficient, although it should afterwards turn out that the real intention was less criminal, or was even innocent. This apparent intent is to be collected from the attending circumstances."

In *State* v. *Benham,* 23 Iowa, 154 (92 Am. Dec. 416), we find the following:

"There can be no successful setting up of self-defense, unless the necessity for taking life is actual, present, urgent,—unless, in a word, the taking of his adversary's life is the only reasonable resort of the party to save his own life, or his person from dreadful harm, or severe calamity, felonious in its character."

In *State* v. *Kennedy,* 20 Iowa, 569, the trial court told the jury among other things that: "Unless there

be a plain manifestation of a felonious intent, no assault will justify killing the assailant''; and Mr. Justice DILLON, speaking for the appellate court, said that the charge of the trial judge expressed the law ''unless changed by statute.'' In *Acers* v. *United States*, 164 U. S. 388, 391 (41 L. Ed. 481, 17 Sup. Ct. Rep. 91, 92, see, also, Rose's U. S. Notes), the trial court charged the jury that: ''Great injury to the person injured that would maim him, or that would be permanent in its character, or that might produce death''; and it was held that this ''was a fair definition of what is necessary to constitute self-defense by reason of the existence of real danger.'' Among the multitude of reported decisions announcing the rule as stated in *Pond* v. *People* and kindred precedents, the following may be found: *State* v. *Thompson*, 9 Iowa, 188 (74 Am. Dec. 342); *State* v. *Burke*, 30 Iowa, 331; *Commonwealth* v. *Riley*, Thach. C. Cas. 471; *Shorter* v. *People*, 2 N. Y. 193 (51 Am. Dec. 286); *Brownell* v. *People*, 38 Mich. 732; *United States* v. *Outerbridge*, 5 Sawy. 620 (Fed. Cas. No. 15,978). Additional authorities may be found in the opinion of Mr. Justice BENNETT rendered in *State* v. *Butler*, (Or.), 186 Pac. 55. At this point, it is worth noting that the excerpt herein quoted from *State* v. *Benham* is quoted with approval in *State* v. *Hawkins*, 18 Or. 476, 487 (23 Pac. 475). *State* v. *Benham* is also cited in *State* v. *Gray*, 43 Or. 446, 456 (74 Pac. 927); and in *State* v. *Doherty*, 52 Or. 591, 596 (98 Pac. 152), this court relied upon *State* v. *Benham* and *Acers* v. *United States, supra.*

The rule of law justifying homicide to prevent felonies extends to violent and forcible acts which are by statute made felonies, even though such acts were not felonies at common law: *Pond* v. *People*, 8 Mich. 150, 181.

There are a few reported decisions found in juris-
dictions, which have no legislation upon the subject,
which either intimate or hold directly that the right of
self-defense is dependent upon the essential quality
and inherent character of the assault itself rather than
upon the grade of punishment attached to it by the law.
Among the former is: *Evans* v. *State,* 120 Ala. 269
(25 South. 175), and yet in addition to what was said
in *Eiland* v. *State,* 52 Ala. 322, that court criticised a
requested charge in *Blackburn* v. *State,* 86 Ala. 595, 599
(6 South. 96), because it did not assert that the "dan-
ger must involve peril to life or limb." A case be-
longing to the latter class and directly holding that the
right of self-defense depends upon the character of
the offense and not upon the penalty attached to it, is
*Gray* v. *Combs,* 7 J. J. Marsh. (Ky.) 478 (23 Am. Dec.
431) ; but Mr. Bishop criticises that case by saying:

"These observations leave out of view the central
truth that legal doctrine is shaped to promote cer-
tainty of judicial decision, as well as justice in the par-
ticular instances. And among the distinctions devised
to bring together justice and certainty is the division of
crime into felony and misdemeanor, with the different
consequences which flow from each": 1 Bishop's New
Criminal Law, 515.

In brief, the rule seems to be as firmly established as
quantity and quality of precedents can establish any
given doctrine that the right of self-defense, in the ab-
sence of a statute, is at common law limited to the pre-
vention of felonies; and that an assault, actual or
threatened, which does not really or apparently in-
volve harm amounting to a felony is not "great bodily
harm" within the meaning of the books. It is true
that the classification of crimes under our Code turns
upon the penalty attached to a given crime; but the

same thing has always been true of crimes at common law. In 2 Pollock and Maitland on History of English Law, 466, the authors define felonies and there remark:

"We thus define felony by its legal effect; any definition that would turn on the quality of the crime is unattainable."

If we now turn to our Code and examine the chapter on "crimes against the person" it will be seen that every crime in the chapter is made a felony within the meaning of the law of self-defense, which deems an act a felony if it may be punished by imprisonment in the penitentiary, except Section 1924, L. O. L., defining assault and battery, Section 1925, L. O. L., which makes it an offense purposely to point a gun at another even though done without malice, and Section 1930, L. O. L., which defines libel; so that if Section 1909, L. O. L., is construed to mean what it plainly says, it is equivalent to saying, so far as practical results are concerned, that slaying in self-defense may if necessary be resorted to in order to prevent any "known" crime against the person except simple assault and battery. The act of pointing a gun at another may also, in certain circumstances, actually be or appear to be a felony. And, hence, for all practical purposes it may with propriety be said that Section 1909, L. O. L., includes every offense involving bodily harm, except the single misdemeanor of simple assault and battery.

The legislation in Georgia is exactly like the legislation in this state. There as here, crimes are divided into felonies and misdemeanors; and there as here, felonies include all offenses punishable by death or imprisonment in the penitentiary, while "every other crime is a misdemeanor": 6 Park's Ann. Code of Ga.

94 Or.—31

(1914), § 2. In Section 70 of the Georgia Code we read:

"There being no rational distinction between excusable and justifiable homicide, it shall no longer exist. Justifiable homicide is the killing of a human being by commandment of the law in execution of public justice; by permission of the law in advancement of public justice; in self-defense, or in defense of habitation, property, or person, against one who manifestly intends or endeavors, by violence or surprise, to commit a felony on either; or against any persons who manifestly intend and endeavor, in a riotous and tumultuous manner, to enter the habitation of another for the purpose of assaulting or offering personal violence to any person dwelling or being therein."

This statute has been in force in Georgia since 1817: Prince's Digest of Laws of Ga. 347; and beginning with *Hudgins* v. *State,* 2 Kelly (2 Ga.), 173, 182, decided in 1847, down to the latest reported decision, the Supreme Court of that state has consistently upheld the statute and ruled that a killing to prevent an injury not amounting to more than a misdemeanor is not justifiable.

In *Powell* v. *State,* 101 Ga. 9, 23 (29 S. E. 309, 318, 65 Am. St. Rep, 277), it is said that Section 70 and another section of the Georgia Code "are parts of the common law." In *Battle* v. *State,* 103 Ga. 53, 59 (29 S. E. 491, 493), the trial judge refused to charge the jury that:

"If the jury should believe from the evidence that the defendant hit the deceased the fatal blow in defense of his person, to prevent a serious personal injury, the defendant would be justified in killing the deceased; or that defendant killed deceased to prevent a felony being committed upon his property by deceased, then the killing would be justifiable; or if the killing was done to prevent the deceased from com-

mitting a trespass upon his property, the killing would not be murder, but would only be manslaughter.''

On appeal the defendant complained because the requested charge was not given and the Supreme Court said:

''We cannot think that any proposition contained in this written request to charge should have been given in charge to the jury.   So far as the first is concerned, it is not the law.   The language of our Code justifies a homicide to prevent the commission of a felony upon the person of the slayer.   An act of violence committed on the person of another, which is included within the class of offenses which the law declares to be felonious, will always include a serious personal injury; but an act of violence so committed, although it amounts to a 'serious personal injury' does not necessarily come within the class of crimes known as felonies.   If, under our Code, the injury about to be inflicted was less than a felony, it would not be sufficient cause to justify the taking of life in self-defense. This justification is complete only (when the life of the assailant is taken) where the deceased, manifestly intended or endeavored by violence or surprise to commit a felony on the person of the accused.''

In *Drew* v. *State,* 136 Ga. 658, 661 (71 S. E. 1108, 1110), Mr. Justice LUMPKIN ruled as follows:

''It may be said that the taking of human life by a private person is a grave matter, and is generally to be justified only as an actual or reasonably apparent necessary defensive or preventive measure against a trespass amounting to a felony.''

The following are among the other Georgia precedents: *Keener* v. *State,* 18 Ga. 194 (63 Am. Dec. 269); *Aaron* v. *State,* 31 Ga. 167; *Simmons* v. *State,* 79 Ga. 696 (4 S. E. 894); *Cumming* v. *State,* 99 Ga. 664 (27 S. E. 177); *Crawford* v. *State,* 90 Ga. 701 (17 S. E. 628, 35 Am. St. Rep. 242); *Smarrs* v. *State,* 131 Ga. 21

(61 S. E. 914); *McCray* v. *State,* 134 Ga. 416 (68 S. E. 62, 20 Ann. Cas. 101); *Worley* v. *State,* 136 Ga. 231 (71 S. E. 153); *Johnson* v. *State,* 136 Ga. 804 (72 S. E. 233).

While it has been held that the refusal to give a requested instruction defining the meaning of the term "felony," it has also been decided that, in the absence of, a request, failure to inform the jury of the meaning of the word will not necessarily work a reversal: *Holland* v. *State,* 3 Ga. App. 465 (60 S. E. 205); *Roberts* v. *State,* 114 Ga. 450 (40 S. E. 297); *Pickens* v. *State,* 132 Ga. 46 (63 S. E. 783); *Mills* v. *State,* 133 Ga. 155 (65 S. E. 368); *Scott* v. *State,* 137 Ga. 337 (73 S. E. 575); *Helms* v. *State,* 138 Ga. 826 (76 S. E. 353).

If we again give our attention to our own precedents' we shall see that, although the words "great bodily harm" have become a part of our judicial vocabulary, nevertheless, it has never been expressly decided that Section 1909, L. O. L., does not mean what it says; but, upon the contrary, this court has more than once used the words "felony" and "felonious" when describing the character of the assault which will justify slaying in self-defense: *Goodall* v. *State,* 1 Or. 334, 338 (80 Am. Dec. 396). In *State* v. *Olds,* 19 Or. 397, 431 (24 Pac. 394, 417), we read:

"The right either of the state or of an individual to take human life must be sanctioned by law. In the latter case it must appear that it was done to prevent the commission of a felony upon the individual, etc., as provided in" Section 1909, L. O. L.

In *State* v. *Smith,* 43 Or. 109, 117 (71 Pac. 973, 976), it was said:

"Before one can excuse his conduct in taking the life of another, it must appear that it was done to prevent the apparent commission of a felony by the latter

upon him": citing *State* v. *Olds,* 19 Or. 397 (24 Pac. 394).

In *State* v. *Doherty,* 52 Or. 591, 596 (98 Pac. 152, 154), we find the following:

"Fear of a slight injury is not sufficient, nor will a mere assault, not felonious, furnish an excuse for the taking of life. * * But, considering the relative age and strength of the parties or the ferocity of the attack, if the intended beating is of such a character as to endanger life or limb, then it will be felonious, and the assaulted person is justified in taking the life of his assailant if necessary to preserve his own or protect him from such beating."

In *State* v. *Walsworth,* 54 Or. 371 (103 Pac. 516), Charles H. Walsworth and Norval Walsworth were tried and convicted of the murder of James F. Mankin. They defended upon the ground of self-defense; and they also asserted the right of Norval Walsworth to protect his mother from danger. Referring to the charge given to the jury this court, speaking through Mr. Justice McBRIDE, used the following language:

"The charge of the court admirably stated the issue to the jury, and the general charge upon the law of self-defense, so far as it related to the right of Norval and Charles H. Walsworth to defend themselves, is a *model* charge; but the court entirely omitted to charge the jury upon the right of defendant, Norval Walsworth, to protect his mother from danger to her life from an alleged unjustifiable attack upon the house by deceased and his brother."

An examination of the original record shows that this "model charge" upon the subject of self-defense contains the following language taken from *State* v. *Benham,* 23 Iowa, 154 (92 Am. Dec. 416), and repeated approvingly in *State* v. *Hawkins,* 18 Or. 476, 487 (23 Pac. 475, 479):

"The law regards human life as the most sacred of all interests committed to its protection, and there can be no successful setting up of self-defense, unless the necessity of taking life is actual, present, urgent, unless in a word, the taking of his adversary's life is the only reasonable resort of the party to save his own life or his person from deadly harm or severe calamity felonious in its character."

The following are additional apropos decisions rendered by this court: State v. *Tarter,* 26 Or. 38, 45 (37 Pac. 53); State v. *Thompson,* 49 Or. 46, 49 (88 Pac. 583, 124 Am. St. Rep. 1015); State v. *Young,* 52 Or. 227, 232 (96 Pac. 1067, 132 Am. St. Rep. 689, 18 L. R. A. (N. S.) 688).

When our statute justifies homicide to prevent a felony, it is a confirmation rather than a departure from the common-law rule. Violence to the person which amounts to no more than the misdemeanor of simple assault and battery does not justify taking life; but a person is justified in slaying to avert imminent danger of violence amounting to a felony. Violence which rises to the degree of a felony is "great bodily harm"; violence which falls to the degree of a misdemeanor is not "great bodily harm." There was no error in informing the jury that "the danger must be that of a threatened felony."

I concur with Mr. Justice BURNETT's criticism of that part of the charge to the jury which speaks of indirect evidence; and I also concur in what he says on the subject of uncommunicated threats.

The judgment should be reversed and a new trial granted for the reasons hereinbefore stated.

McBRIDE, C. J., and BEAN, BENSON and BENNETT, JJ., concur.